**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| GALEN HOSPITAL ALASKA, INC. D/B/A ALASKA REGIONAL HOSPITAL, HCA-HEALTHONE LLC D/B/A HCA HEALTHONE PRESBYTERIAN/ST. LUKE'S MEDICAL CENTER, and D/B/A HCA HEALTHONE ROSE MEDICAL CENTER, and SAVANNAH HEALTH SERVICES, LLC D/B/A MEMORIAL HOSPITAL UNIVERSITY MEDICAL CENTER, | CASE NO.: <br><br> NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §1441(c) (FEDERAL QUESTION JURISDICTION) <br><br> ALLEGHENY COUNTY COURT OF COMMON PLEAS NO: GD-26-001012 |
| Plaintiffs, | |
| v. | |
| HIGHMARK INC. D/B/A HIGHMARK BLUE CROSS BLUE SHIELD, | |
| Defendant. | |

## DEFENDANT HIGHMARK INC.'S NOTICE OF REMOVAL

Defendant Highmark Inc. ("Highmark"), by and through its undersigned attorneys, Reed Smith LLP, hereby respectfully removes Case No. GD-26-001012 from the Allegheny County Court of Common Pleas to the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. Removal of this action is proper because federal question jurisdiction exists, given that the Plaintiffs Galen Hospital Alaska, Inc. d/b/a Alaska Regional Hospital, HCA-HealthOne LLC d/b/a HCA HealthONE Presbyterian/St. Luke's Medical Center and d/b/a HCA HealthONE Rose Medical Center, and Savannah Health Services, LLC d/b/a Memorial Health University Medical Center (collectively, "Plaintiffs" or "Hospitals") seek to recover healthcare benefits that are governed by the Employee Retirement

Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. ("ERISA").  In support of this Notice of Removal, Highmark alleges as follows:

## I.    BACKGROUND

1.    On February 12, 2026, Plaintiffs filed a Complaint (the "Complaint") in the Allegheny County Court of Common Pleas, Case No. GD-26-001012.  (*See* Exhibit 1).  Highmark accepted service of the Complaint on February 19, 2026. Accordingly, removal is timely under 28 U.S. Code § 1446(b).

2.    The Complaint contains causes of action for breach of contract, breach of implied-in-fact contract, promissory estoppel, and quantum merit.  (*Id*.)  Specifically, Plaintiffs allege that they provided medically necessary treatment to five beneficiaries of Highmark health plans and that Highmark failed to pay in full for those services.  (*Id*. at ¶¶ 50-96.)  Plaintiffs does not provide the names of any insureds in their Complaint, but through a confidential claims list accompanying the Complaint and Defendant's independent investigation, Defendants discovered that at least 3 of the claims at issue involve plans governed by ERISA.[1]  (*See* Declaration of Marc Pogonovich ("Pogonovich Decl."), attached as Exhibit 2, at ¶ 4.)

3.    Because Plaintiffs appear to be suing for recovery of benefits under plans governed by ERISA § 502(a)(1)(B), this case is removable under 28 U.S.C. § 1441.

## II.    FEDERAL QUESTION JURISDICTION

4.    This case has been removed to federal court because it involves claims by Plaintiffs related to benefits provided under healthcare benefit plans that are governed by ERISA, and thus Plaintiffs' claims are preempted by ERISA.

---

[1] Highmark is not providing the full names of these insureds in this pleading to protect their personally identifiable information. Highmark will provide the insureds' names and policy information to Plaintiffs after a protective order is entered.

5.    The United States District Court for the Western District of Pennsylvania has original jurisdiction over Plaintiffs' causes of action under 28 U.S.C. § 1331, in that federal question jurisdiction exists, and Highmark may remove the action to this Court under 28 U.S.C. § 1441.

6.    Federal question jurisdiction exists when state-law claims are completely preempted by Section 502(a) of ERISA. *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004).

7.    Section 502(a) of ERISA completely preempts "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy" because such a cause of action "conflicts with the clear congressional intent to make the ERISA remedy exclusive…." *Id.* "In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely preempted by ERISA § 502(a)(1)(B)." *Id.* at 210.

8.    As a result, complete preemption under Section 502(a) is "an exception to the well-pleaded complaint rule," and a case may be removed to federal court even though the petition does not assert a cause of action under federal law if the plaintiff asserts a state-law cause of action that duplicates, supplements or supplants the remedies provided by ERISA. *Id.* at 207-08.

9.    The healthcare benefits that Plaintiff seeks to recover are provided through "employee welfare benefit plans" that are subject to ERISA. ERISA's provisions apply to any "employee benefit plan" that is "established or maintained … by any employer engaged in commerce or in any industry or activity affecting commerce…." 29 U.S.C. § 1003(a)(1). ERISA defines an "employee benefit plan" (or "plan") as "an employee welfare benefit plan." 29 U.S.C. § 1002(3). ERISA in turn defines an "employee welfare benefit plan" as "any plan, fund, or

program … established or maintained by an employer … for the purpose of providing … benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1).

10.    Here, the healthcare benefits Plaintiffs seek to recover were provided through employee welfare benefit plans governed by Section 502(a) of ERISA.  Pogonovich Decl., ¶ 4.

11.    Plaintiffs allege that Highmark breached its obligations to its subscribers, who receive coverage pursuant to health benefit plans they entered into with Highmark. Thus, Plaintiffs' causes of action are entirely based upon Highmark's alleged obligations under the plans, which, as demonstrated above, are "employee welfare benefit plans" governed by ERISA.

12.    Because Plaintiffs' causes of action "derive entirely from the particular rights and obligations established by" the Plan, they are completely preempted by Section 502(a) and removable to federal court.  *Davila*, 542 U.S. at 213-14; *see also Menkes v. Prudential Ins. Co. of America*, 762 F.3d 285, 293-297 (3d Cir. 2014) (state law claims were held to be properly dismissed under ERISA because the claims related to the administration of an ERISA-regulated plan).

13.    Therefore, this Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1131 and 29 U.S.C. § 1132(a).

### III.    ADDITIONAL REQUIREMENTS FOR REMOVAL ARE SATISFIED

14.    Venue is proper in this Court because the action is being removed from the Court of Common Pleas of Allegheny County, which lies in Allegheny County Pennsylvania, within the Western District of Pennsylvania.

15.    Pursuant to 28 U.S.C. § 1446(d), Highmark will promptly give Plaintiffs written notice of the filing of this Notice of Removal and will promptly file a copy of this Notice of Removal with the Clerk for the Allegheny County Court of Common Pleas, where the Complaint was filed.

16.    Pursuant to 28 U.S.C. § 1446(a), Highmark has included copies of all process, pleadings, and orders on file with the state court to this Notice.  (Ex. 1.)

Wherefore, Highmark hereby removes this action to the United States District Court for the Western District of Pennsylvania.


DATED:  March 12, 2026

                                        **REED SMITH LLP**

                                        */s/ Alessandra P. Allegretto*
                                        William J. Sheridan
                                        Pa. Bar No. 206718
                                        Alessandra P. Allegretto
                                        Pa. Bar No. 331254
                                        Reed Smith Centre
                                        225 Fifth Avenue
                                        Pittsburgh, PA 15222-2716
                                        Tel. 412.288.3131
                                        Fac. 412.288.3063
                                        wsheridan@reedsmith.com
                                        aallegretto@reedsmith.com

                                        *Counsel for Defendant*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system.  I also certify that a copy of the foregoing instrument was served upon the attorneys of record for the Plaintiff via U.S. Mail on this 12th day of March, 2026.


 /s/ Alessandra P. Allegretto
Alessandra P. Allegretto

*Counsel for Defendant*


**Copies Forwarded To:**

Nipun J. Patel, Esq. (PA ID No. 208130)
Andrew J. Soven, Esq. (PA ID No. 76766)
Three Logan Square, Suite 1200
Philadelphia, PA 19103
Phone: (215) 267-3001
Fax: (215) 267-3002
npatel@polsinelli.com
asoven@polsinelli.com

**Attorneys for Plaintiff**

# EXHIBIT 1

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CIVIL DIVISION

### COVER SHEET

Plaintiff(s)

Galen Hospital Alaska, Inc.
D/B/A Alaska Regional Hospital
One Park Plaza
Legal Department
Nashville, TN 37203,
HCA-HEALTHONE LLC D/B/A
HCA HEALTHONE
PRESBYTERIAN/St. Luke's Medical
Center, and D/B/A
HCA HEALTHONE ROSE MEDICAL CENTER,
4900 S Monaco Street, Suite 380
Denver, CO 80237,
and SAVANNAH HEALTH SERVICES,
LLC D/B/A Memorial Hospital
University Medical Center
One Park Plaza
Legal Department
Nashville, TN 37203,

Vs

Defendant(s)

HIGHMARK INC. D/B/A HIGHMARK
BLUE CROSS BLUE SHIELD,
Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA 15222-3099

---

### CIVIL DIVISION

Case Number :

| GD | 26 | 001012 |
|----|----|--------|

Type of pleading :

Complaint

Code and Classification :

Filed on behalf of

Plaintiffs

(Name of the filing party)

☑ Counsel of Record

☐ Individual, If Pro Se

Required Information:

Name:    Andrew J. Soven

Address: 1717 Arch Street, Suite 1200

Philadelphia, PA 19103

Phone Number: 215-267-3001

Email Address: asoven@polsinelli.com

Attorney's State ID : 76766

Attorney's Firm ID : 5210

[cover]

## COURT OF COMMON PLEAS OF ALLEGHENY

GALEN HOSPITAL ALASKA, INC. D/B/A
ALASKA REGIONAL HOSPITAL,

HCA-HEALTHONE LLC D/B/A HCA
HEALTHONE PRESBYTERIAN/ST. LUKE'S
MEDICAL CENTER, AND D/B/A HCA
HEALTHONE ROSE MEDICAL CENTER,

and

SAVANNAH HEALTH SERVICES, LLC D/B/A
MEMORIAL HEALTH UNIVERSITY
MEDICAL CENTER,

      PLAINTIFFS,

  v.

 HIGHMARK INC. D/B/A HIGHMARK
 BLUE CROSS BLUE SHIELD,

      DEFENDANT.

IN THE COURT OF COMMON PLEAS OF
ALLEGHENY COUNTY

CIVIL ACTION – LAW

CASE NO. GD-26-001012

NOTICE TO DEFEND AGAINST CLAIMS

### NOTICE TO DEFEND

### NOTICE

**You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.**

***You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.***

**Lawyer Referral Service**
**The Allegheny County Bar Association**
**400 Koppers Building**
**436 Seventh Avenue**
**Pittsburgh, Pennsylvania 15219 (412) 261-5555**

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| GALEN HOSPITAL ALASKA, INC. D/B/A ALASKA REGIONAL HOSPITAL, | : | CIVIL ACTION – LAW |
| | : | |
| | : | DOCKET NO.: GD-26-001012 |
| | : | |
| HCA-HEALTHONE LLC D/B/A HCA HEALTHONE PRESBYTERIAN/ST. LUKE'S MEDICAL CENTER, AND D/B/A HCA HEALTHONE ROSE MEDICAL CENTER, | : | COMPLAINT |
| and | : | |
| SAVANNAH HEALTH SERVICES, LLC D/B/A MEMORIAL HEALTH UNIVERSITY MEDICAL CENTER, | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| v. | : | |
| | : | Filed on behalf of Plaintiffs: |
| HIGHMARK INC. D/B/A HIGHMARK BLUE CROSS BLUE SHIELD, | : | GALEN HOSPITAL ALASKA, INC., *et al*. |
| | : | |
| DEFENDANT. | : | Counsel of Record for these Parties: |
| | : | |
| | : | Nipun J. Patel, Esq. (PA ID No. 208130) |
| | : | Andrew J. Soven, Esq. (PA ID No. 76766) |
| | : | |
| | : | POLSINELLI PC |
| | : | Three Logan Square, Suite 1200 |
| | : | Philadelphia, PA 19103 |
| | : | (215) 267-3001 |

_____
Attorney for Plaintiffs

**POLSINELLI P.C.**
Nipun J. Patel, Esq. (PA ID No. 208130)
Andrew J. Soven, Esq. (PA ID No. 76766)
Three Logan Square, Suite 1200
Philadelphia, PA 19103
Phone: (215) 267-3001
Fax: (215) 267-3002
npatel@polsinelli.com
asoven@polsinelli.com
*Attorneys for Plaintiffs*

|  |  |
|---|---|
| **GALEN HOSPITAL ALASKA, INC. D/B/A ALASKA REGIONAL HOSPITAL** <br> **One Park Plaza** <br> **Legal Department** <br> **Nashville, TN 37203,** | **COURT OF COMMON PLEAS ALLEGHENY COUNTY** |
| **HCA-HEALTHONE LLC D/B/A HCA HEALTHONE PRESBYTERIAN/ST. LUKE'S MEDICAL CENTER, AND D/B/A HCA HEALTHONE ROSE MEDICAL CENTER,** <br> **4900 S Monaco Street, Suite 380** <br> **Denver, CO 80237,** | **Case No. GD-26-001012** <br><br> **JURY TRIAL DEMANDED** |
| **and** | |
| **SAVANNAH HEALTH SERVICES, LLC D/B/A MEMORIAL HEALTH UNIVERSITY MEDICAL CENTER** <br> **One Park Plaza** <br> **Legal Department** <br> **Nashville, TN 37203,** | |
| **PLAINTIFFS,** | |
| **v.** | |
| **HIGHMARK INC. D/B/A HIGHMARK BLUE CROSS BLUE SHIELD,** <br> **Fifth Avenue Place** <br> **120 Fifth Avenue** <br> **Pittsburgh, PA 15222-3099,** | |
| **DEFENDANT.** | |

## COMPLAINT

Plaintiffs, Galen Hospital Alaska, Inc. d/b/a Alaska Regional Hospital, HCA-HealthOne LLC d/b/a HCA HealthONE Presbyterian/St. Luke's Medical Center and d/b/a HCA HealthONE Rose Medical Center, and Savannah Health Services, LLC d/b/a Memorial Health University Medical Center (collectively, "Plaintiffs" or "Hospitals"), by and through their undersigned counsel, Polsinelli P.C., file this Complaint against Defendant, Highmark Inc. d/b/a Highmark Blue Cross Blue Shield ("Highmark" or "Defendant"), and in support thereof states the following:

### PRELIMINARY STATEMENT

1.      This action arises out of Highmark's wrongful denial of certain claims for reimbursement submitted by Plaintiffs for medical services provided to Highmark Subscribers (defined below) in violation of one or more agreements obligating Highmark to reimburse Plaintiffs at specified rates for such medical services.

2.      Plaintiffs contracted with non-parties PremeraFirst, Anthem CO, and Anthem GA (defined below), which are the BCBSA (defined below) licensees for the States of Alaska, Colorado, and Georgia under Provider Agreements (defined below). The Provider Agreements between Plaintiffs and PremeraFirst, Anthem CO, and Anthem GA set forth the terms under which Plaintiffs will treat subscribers of BCBSA plans outside the States of Alaska, Colorado, and Georgia through the "BlueCard Program" and be reimbursed for that treatment.

3.      The BlueCard Program allows subscribers of any out-of-state BCBSA licensee to obtain medical services from healthcare providers across the nation at in-network rates by accessing the local medical providers' contracts with the local (in-state) BCBSA licensee. Under the BlueCard Program, when a subscriber receives care in another state, the medical or hospital provider communicates with and submits claims to the local BCBSA plan for that state (called the

2

"Host Plan"), and the Host Plan then forwards the information to the out-of-state BCBSA licensee through which the subscriber is insured (the "Home Plan"). The Home Plan makes coverage determinations and forwards payment to the Host Plan, which the Host Plan then transmits to the provider. The Home Plan is obligated to pay for the services provided to its subscribers under the BlueCard Program at the rates set forth in the Host Plan's contract with the provider.

4.      The Provider Agreements between Plaintiffs and PremeraFirst, Anthem CO, and Anthem GA require BCBSA licensees for other states (referred to in the Provider Agreement as "Affiliates," "Other Payors" and/or "Plans") that access the Provider Agreements through the BlueCard Program to comply with the Provider Agreements' terms and conditions, including the payment rates in the Provider Agreements.

5.      Upon information and belief, each BCBSA licensee also signs a license agreement with the BCBSA in which it agrees to participate in the BlueCard Program and to pay claims submitted by providers through the BlueCard Program at the rates set forth in the providers' contracts with the Host Plan.

6.      Highmark is one of the BCBSA licensees for the State of Pennsylvania, and Highmark participates in the BlueCard Program. Upon information and belief, Highmark has a License Agreement (defined below) with the BCBSA, in which it promises to ensure out-of-state providers are paid at the rates set forth in their contracts with the Host Plan when providers render medical services to Highmark's subscribers through the BlueCard Program.

7.      Five of Highmark's subscribers received medical care at the Hospitals through the BlueCard Program while living or traveling in Alaska, Colorado, or Georgia. Accordingly, Highmark accessed the Provider Agreements between Plaintiffs and the Host Plans (here, PremeraFirst, Anthem CO, and Anthem GA), including the discounted payment rates set forth

therein. By accessing the Provider Agreements, Highmark agreed to be bound by the Provider Agreements' claims adjudication provisions, including their payment terms.

8.      Plaintiffs provided medically necessary, covered services to Highmark's Subscribers and submitted claims for reimbursement for the medical care provided to them to PremeraFirst, Anthem CO, and Anthem GA. PremeraFirst, Anthem CO, and Anthem GA forwarded the claims to Highmark for Highmark to adjudicate in accordance with the terms of the Provider Agreements, as well as, upon information and belief, in accordance with the promises of Highmark in the License Agreement. In accordance with the BlueCard program, the Hospitals submitted their claims for reimbursement to PremeraFirst, Anthem CO, and Anthem GA who, upon information and belief, forwarded and priced the claims to Highmark per the rates in the Provider Agreements. Highmark, however, wrongfully denied payment for the services provided by Plaintiffs to its Subscribers.

9.      Defendant Highmark was aware, or should have been aware, of its obligation to reimburse Plaintiffs in accordance with the Provider Agreements and its License Agreement. By failing to do so, Highmark breached the Provider Agreements, to which Plaintiffs are parties, and the License Agreement, of which Plaintiffs are, upon information and belief, third party beneficiaries.

10.     Alternatively, if Highmark is not obligated to reimburse Plaintiffs at the rates set forth in the Provider Agreements based on its use of the Provider Agreement or the License Agreement, Highmark is liable to Plaintiffs for the rates in the Provider Agreements under the theories of implied-in-fact contract, quantum meruit, and/or promissory estoppel.

<u>**PARTIES**</u>

11.     Plaintiff Galen Hospital Alaska, Inc. d/b/a Alaska Regional Hospital ("Alaska Regional") is a Delaware corporation operating in the municipality of Anchorage, Alaska.

12.     Plaintiff HCA-HealthOne LLC d/b/a HCA HealthONE Presbyterian/St. Luke's Medical Center ("St. Luke's") and d/b/a HCA HealthONE Rose Medical Center ("Rose") is a Colorado limited liability company operating in Denver County, Colorado.

13.     Plaintiff Savannah Health Services, LLC d/b/a Memorial Health University Medical Center ("Memorial"), is a is a Delaware limited liability company operating in Chatham County, Georgia.

14.     Defendant Highmark is a Pennsylvania nonprofit corporation with its principal place of business located at 120 Fifth Avenue Pittsburgh, PA 15222-3099. Upon information and belief, Defendant can be served through its registered address, at 1800 Center St. Camp Hill, PA 17011-0.

<u>**JURISDICTION AND VENUE**</u>

15.     Jurisdiction and venue are proper in the Allegheny Court of Common Pleas pursuant to 42 Pa. C.S.A. § 931(a) and Rules 1006(a)(1)-(3) and 2179(a)-(b) of the Pennsylvania Rules of Civil Procedure.

16.     Allegheny County, Pennsylvania is the appropriate venue for this dispute because Highmark is headquartered in Allegheny County, and many of the acts upon which Plaintiffs base their claims occurred in part in Allegheny County.

## FACTUAL BACKGROUND

### I.    THE PROVIDER AGREEMENTS AND THE BLUECARD PROGRAM

17.    Plaintiffs are acute care hospital systems located in the states of Alaska, Colorado, and Georgia. Plaintiffs provide medically necessary services to patients in their local communities.

18.    As part of their provision of medically necessary services, Plaintiffs contract with local Blue Cross and Blue Shield ("BCBS") plans through several agreements. Specifically,

    i.    Alaska Regional contracted with PremeraFirst, Inc. ("PremeraFirst") under the PremeraFirst Facility Agreement (eff. December 15, 2016) (as amended, the "PremeraFirst Agreement");

    ii.    St. Luke's and Rose, by and through their disclosed agent, Continental Division I, Inc., contracted with Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield and HMO Colorado, Inc. d/b/a HMO Colorado ("Anthem CO") under the Anthem Blue Cross and Blue Shield Facility Agreement (eff. May 1, 2012) (as amended, the "Anthem CO Agreement"); and

    iii.    Memorial, by and through its disclosed agent, TriStar Health System, Inc., contracted with Blue Cross and Blue Shield of Georgia, Inc. and Blue Cross Blue Shield Health Plan of Georgia, Inc. ("Anthem GA") under the Blue Cross Blue Shield Facility Agreement (eff. October 15, 2025) (as amended "Anthem GA Agreement," or collectively with the PremeraFirst and Anthem CO Agreement, the "Provider Agreements").[1]

---

[1] The Provider Agreements contain confidentiality provisions that prevent Plaintiffs from attaching them to this Complaint. The Provider Agreements will be produced pursuant to a valid discovery request once a protective order has been entered.

19.     The Provider Agreements specify the terms and conditions under which Plaintiffs will treat patients with BCBS health plans, referred to in the Provider Agreements and herein as "subscribers,"[2] and be reimbursed for that treatment. Under the Provider Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary services to a subscriber.

20.     The Provider Agreements are far broader than the relationship between just PremeraFirst, Anthem CO, and Anthem GA (collectively, the "Local Plans"), Plaintiffs, and subscribers enrolled in the Local Plans. The Provider Agreements also cover treatment that Plaintiffs provide through the "Blue Cross Blue Shield Out of Area Program," "Inter-Plan Program," or "BlueCard Program," (referred to hereinafter as the "BlueCard Program") to any subscribers enrolled in any BCBS health plan, including subscribers who are insured by another state's BCBSA licensee. Highmark is a BCBSA licensee for the State of Pennsylvania, and when the patients at issue in this dispute, who were insured by Highmark (the "Subscribers"), received medical care at the Hospitals in Alaska, Colorado, and Georgia, the claims associated with such care were properly initially submitted to the Local Plans (BCBSA licensees for the States of Alaska, Colorado, and Georgia) for processing in accordance with the terms of the Local Plans' contracts with the Hospitals, which are the Provider Agreements. Highmark is bound, and at all materials times intended to be bound, by the Provider Agreements in multiple ways: (a) by reason of its status as an "Affiliate" of PremeraFirst, Anthem CO, and Anthem GA under the Provider Agreements; (b) as "Other Payor" under the Anthem CO Agreement and Anthem GA Agreement; and (c) by its participation in the BlueCard Program, which is explained in more detail below.

---

[2] When used generally herein, the term "subscribers" is not capitalized. When the term is used to refer to the specific patients at issue in this dispute, the defined term "Subscribers" is used.

21.     The Provider Agreements state that (i) Plaintiffs will provide services to subscribers of out-of-state BCBS plans through the BlueCard Program; (ii) such out-of-state BCBS plans, as "Affiliates" of PremeraFirst, Anthem CO, and Anthem GA under the Provider Agreements and/or as "Other Payors" under the Anthem CO Agreement and Anthem GA Agreement, intentionally access the discounted rates set forth in the Provider Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program; and (iii) the-out-of-state plans, as "Affiliates" of PremeraFirst, Anthem CO, and Anthem GA under the Provider Agreements and/or as "Other Payors" under the Anthem CO Agreement and Anthem GA Agreement, are bound by the terms and conditions of the Provider Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program, which terms and conditions include the obligation to pay claims in accordance with and at the rates in the Provider Agreements.

22.     In the present case, Highmark, by participating in the BlueCard Program agreed to be an "Affiliate" of PremeraFirst, Anthem CO, and Anthem GA under the Provider Agreements and/or as "Other Payors" under the Anthem CO Agreement and Anthem GA Agreement.

23.     The Anthem CO Agreement and Anthem GA Agreement provide that an "Affiliate" of Anthem CO and Anthem GA may access the terms of the Anthem CO Agreement and Anthem GA Agreement, including St. Luke's, Rose's, and Memorial's services and the reimbursement rates set forth therein.

24.     When an "Affiliate" accesses St. Luke's, Rose's, and Memorial's services and reimbursement rates set forth in the Anthem CO Agreement and Anthem GA Agreement, such "Affiliate" becomes a "Plan" responsible for paying the services rendered by St. Luke, Rose, and Memorial to the subscribers of the "Affiliate" at the rates set forth in the Anthem CO Agreement and Anthem GA Agreement.

25.    Under the Anthem CO Agreement and Anthem GA Agreement, Highmark also meets the definition of "Other Payor" under the contracts, as such definition expressly includes "Affiliates" and other BCBS plans that access the Anthem CO Agreement and Anthem GA Agreement.

26.    The Anthem CO Agreement and Anthem GA Agreement provide that when "Other Payors" access St. Luke's, Rose's, and Memorial's services and rates, "Other Payors," like "Affiliates," become a "Plan" responsible for paying St. Luke, Rose, and Memorial for services provided to the "Plan's" subscribers in accordance with the payment provisions, and at the rates set forth in, the Anthem CO and Anthem GA Agreement.

27.    Similarly, under the PremeraFirst Agreement, Highmark meets the definition of "Plan," as such definition, through other defined terms, including but not limited to "Affiliate," "Enrollee," "Plan Payment," and "Subscriber Agreement" includes BCBS plans that contract with PremeraFirst and assume financial responsibility for the payment of a subscriber's care.

28.    The PremeraFirst Agreement provides that when "Affiliates" of the "Plan" access the terms of a "Subscriber Agreement," the "Affiliates" are obligated to reimburse Alaska Regional in accordance with the payment provisions and at the rates set forth in the PremeraFirst Agreement.

29.    Accordingly, under the Provider Agreements, Highmark—as an "Affiliate," "Other Payor," and/or a "Plan" responsible for payment under the Provider Agreements—accessed the terms of the Provider Agreements through the BlueCard Program and is required, and agreed, to pay the Hospitals for the services provided to the Subscribers in accordance with the payment provisions and at the rates set forth in the Provider Agreements.

30.    Under the BlueCard Program, providers submit their claims to the local BCBSA licensee (referred to as the "Host Plan") for the services they provided to a subscriber. Upon

information and belief, the Host Plan then reviews the claim, determines the amount payable under the providers' agreements with the Host Plan, and forwards the claim to the BCBS health plan that insures the subscriber or administers the subscriber's health plan (referred to as the "Home Plan"). Upon information and belief, the Home Plan then applies the subscriber's plan benefits, makes coverage determinations, approves or denies payment for the services, and transmits its decision and payment to the Host Plan. The Host Plan, in turn, transmits the Home Plan's decision and payment to the provider. Importantly, the payment rates and payment provisions specified in the agreements between the Host Plan and the providers govern the amount providers are entitled to be reimbursed for the services provided to the subscriber, regardless of whether that subscriber is a participant in the Host Plan health plan or the Home Plan health plan. The Home Plan accesses and specifically relies upon the rates and payment provisions specified in the providers' agreements with the Host Plan when making payment.

31.     In the present case, Highmark is the Home Plan for the Subscribers. Plaintiffs rendered services to the Subscribers and submitted their claims for such services to PremeraFirst, Anthem CO, and Anthem GA, as the Host Plans, for forwarding to, and payment from, Highmark through the BlueCard Program. Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected Highmark to reimburse them for the services provided to Highmark's Subscribers in accordance with the payment provisions and at the rates set forth in the Provider Agreements.

32.     Plaintiffs' expectations of reimbursement by Highmark at the rates specified in the Provider Agreements were reinforced by Highmark's own conduct and representations, which are consistent with, if not express admissions of, Highmark being bound by the Provider Agreements as an "Affiliate," "Other Payor," and/or a "Plan" responsible for the claims at issue herein.

33.     Upon information and belief, Highmark represents on its website that the Hospitals are "in-network" with Highmark (meaning they are contracted with Highmark). Specifically, Highmark includes a page on its website where its subscribers with Pennsylvania health plans can locate care.[3] Using the "Find Care" tool on Highmark's website reveals that Highmark is "in-network" with the Hospitals for each of the Subscribers' health plans.[4] Highmark's website explains the difference between "in-network" and "out of network" as follows: "Doctors and hospitals that participate with us are called '*in-network*' providers[,] . . . [and] [d]octors and hospitals that do not participate with us are called '*out-of-network*' providers."[5]

34.     Further, in a Frequently Asked Questions ("FAQs") document about the BlueCard program for providers published on Highmark's website (the "BlueCard Program FAQs"), Highmark explains, "BlueCard a national program that enables members of one Blue Plan to obtain healthcare service benefits while traveling or living in another Blue Plan's service area. The program links participating healthcare providers with the independent Blue Cross and Blue Shield Plans across the country, and in more than 200 countries and territories worldwide, through a single electronic network for claims processing and reimbursement."[6] Highmark further explains to its providers that the BlueCard Program lets you "submit claims for patients from other Blue Plans, domestic and international, to your local Blue Cross and/or Blue Shield Plan. The local Blue Cross

---

[3] *See Member Guide*, Highmark (last visited Jan. 20, 2026), https://highmark.com/member/member-guide. A printout of the webpage is attached hereto as Exhibit 1.

[4] *See* Find Care, Highmark (last visited Jan. 20, 2026), https://highmark.com/member/member-guide/find-care. Samples of the search results using Highmark's "Find Care" tool showing the Hospitals as "in-network" for the Subscribers are attached hereto as Collective Exhibit 2.

[5] *See Health Plan Quality Assurance*, Highmark (last visited Jan. 20, 2026), https://www.highmark.com/content/dam/digital-marketing/en/highmark/highmarkdotcom/pdfs/quality-assurance/CS204330_NCQAPreSale_BRO_BCBS_R2.pdf (emphasis added). A printout of Highmark's Health Plan Quality Assurance page is attached hereto as Exhibit 3.

[6] *See BlueCard Program Answers to Frequently Asked Questions*, Highmark (last visited Jan. 20, 2026), https://providers.highmark.com/content/dam/highmark/en/providerresourcecenter/pdfs/all/documents/pdfs/provider-network/inter-plan-programs/bluecard-faqs.pdf. A printout of Highmark's BlueCard Program FAQs is attached hereto Exhibit 4.

and/or Blue Shield Plan is your sole contact for education, contracting, claims payment/adjustments and problem resolution."[7]

35.    The BlueCard Program FAQs also include an explanation of how the BlueCard Program operates, which demonstrates that when a Home Plan's subscriber receives covered services in another state, the Home Plan "adjudicates the claim based on eligibility and contractual benefits" while the Host Plan "applies pricing and reimbursement rules consistent with provider contractual agreements."[8] This means that the Home Plan must pay for the covered services provided to its subscriber at the rates specified in the Host Plan's contract with the provider.[9]

36.    The Host Plan serves as the administrator for the subscribers' health plans when it handles claims through the BlueCard Program,[10] which is evidenced by the Host Plan charging, upon information and belief, an administration fee to the Home Plan. The Host Plan also, upon information and belief, charges an access fee to the Home Plan for access to the rates in the Host Plan's contract with the provider.[11]

37.    Upon information and belief, the Home Plan accounts for all payments made under the BlueCard Program for the Home Plan's subscribers as an expense on its federal taxes, evidencing the Home Plan's financial responsibility for BlueCard claims.

---

[7] *See id.*

[8] *See id.*

[9] *See e.g., In re: Blue Cross Blue Shield Antitrust Litigation* (MDL No. 2406), 308 F. Supp. 3d 1241, 1255 (N.D. Ala. 2018) ("Through the BlueCard program, the Plans have agreed that when a contracted provider treats a patient covered by a Home Plan . . . the Home Plan will reimburse the provider at a rate which equals (at a minimum) the levels received for providers under the provider's contract with its Host Plan.").

[10] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas,* 814 F.3d 242, 246 (5th Cir. 2016) ("BCBSTX acts as the administrator for . . . claims arising under the BlueCard program.").

[11] *See In re: Blue Cross Blue Shield Antitrust Litigation,* 308 F. Supp. 3d at 1255 ("Under BlueCard Rules, an access fee may be charged in connection with processing BlueCard claims, but that fee can be, and is frequently, negotiated or waived.").

38.     Upon information and belief, participation in the BlueCard Program is a required term of the license agreements between BCBSA and all BCBS licensees.[12]

39.     Through this expressly linked network of contracts, the BlueCard Program essentially operates as a rental network: the Host Plan contracts with local providers, the local providers agree to treat subscribers of other out-of- area BCBS health plans under the BlueCard Program, and the Home Plan accesses and pays the negotiated rates in the Host Plan's contracts with the local providers when its subscribers receive care from the local providers.

40.     Upon information and belief, Highmark's obligation to reimburse Plaintiffs at the rates set forth in the Provider Agreements is also evidenced by Highmark's License Agreement entered into between BCBSA and Highmark ("License Agreement"), in which Highmark covenants that it will ensure compliance with the terms and conditions of the BlueCard Program, including its payment obligations to providers who contract with Host Plans.

41.     Specifically, upon information and belief, Highmark goes so far as to promise in the License Agreement that it will arrange for a guarantor of its BlueCard payment obligations.

42.     Upon information and belief, the terms and conditions of the BlueCard Program, as promulgated by the BCBSA, are incorporated by reference into the License Agreement and state that Home Plans must reimburse providers at the rates set forth in the providers' contracts with Host Plans for BlueCard claims.

43.     Applying the mechanics of the BlueCard Program to the present dispute, the BlueCard Program should have operated as follows: Highmark is the Home Plan for the Subscribers. The Subscribers received care at the Hospitals in Alaska, Colorado, and Georgia. Plaintiffs submit their claims for reimbursement for services they provided to Subscribers to

---

[12] *See id.* at 1254 ("Under BlueCard, Plans were required to make their local provider discounts available to all Blue Members, even if they lived in another Plan's service area.").

PremeraFirst, Anthem CO, and Anthem GA (the Host Plans for their respective states). Then, the Host Plans, acting as administrators of the Subscribers' health plans, review the claims, determine the amount that would be payable under the Provider Agreements based on the services Plaintiffs provided to Subscribers, and forward the claims to Highmark (the Home Plan) for adjudication/payment. Highmark applies the Subscribers' health benefits, makes coverage determinations, and approves or denies payment for the services, at the rates set forth in the Provider Agreements. The Local Plans then transmit Highmark's decisions and payments to Plaintiffs.

44.    Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected Highmark to reimburse Plaintiffs for the services provided to its Subscribers at the rates, and upon the terms, specified in the Provider Agreements, which are the rates Highmark agreed to pay, by virtue of its participation in the BlueCard Program; as an "Affiliate," "Other Payor," and/or a "Plan" under the Provider Agreements; and under the License Agreement.

45.    Additionally, for at least some of the Subscribers at issue in this dispute, Plaintiffs received correspondence or communications directly from Highmark, as opposed to the Local Plans, concerning the claims at issue, including authorization decisions and partial payments, further evidencing Highmark's acknowledgment of responsibility for the claims.

46.    Highmark's Subscribers received medical services from Plaintiffs through the BlueCard Program, and accordingly, as an "Affiliate," "Other Payor," and/or a "Plan" under the Provider Agreements, Highmark is contractually bound by the Provider Agreements, including their provisions obligating the "Affiliates," "Other Payors," and/or "Plans" to timely and correctly pay claims at the rates set forth therein. Highmark failed to pay Plaintiffs in accordance with the Provider Agreements.

47.     Highmark benefitted from Plaintiffs' services because Plaintiffs provided medically necessary, covered services to the Subscribers, including emergency medical services to some of the Subscribers, for which Highmark is obligated to pay under state and federal law, and Highmark received and retained premiums from the Subscribers in connection with the services provided. Through their treatment to Subscribers, Hospitals assisted Highmark in meeting its obligations to arrange for timely medical care to its Subscribers. Highmark also received the benefit of discounted rates for the medically necessary services Plaintiffs provided to its subscribers by accessing the negotiated rates set forth in the Provider Agreements between PremeraFirst, Anthem CO, and Anthem GA and Plaintiffs.

48.     Upon information and belief, the BCBSA, of which Highmark is a licensee, recognizes that the BlueCard Program results in increased subscriber enrollment for BCBSA licensees.[13] Accordingly, each time a provider (here, the Hospitals) agree to provide "in-network" care to patients who are enrolled in BCBS health plans in other geographic service areas through the BlueCard Program, it enhances the marketability and potential subscriber enrollment of that BCBSA licensee (here, Highmark).

49.     The BCBSA has also recognized that the BlueCard Program confers multiple procompetitive benefits on BCBSA licensees, including "(i) access to high-quality insurance products with a local focus, broad provider networks, and competitive premiums; (ii) access to a nationwide patient volume for health care providers; and (iii) 'prompt payments, ease of claims processing[,] and lower administrative costs.'"[14]

---

[13] *See In re: Blue Cross Blue Shield Antitrust Litigation*, 308 F. Supp. 3d at 1255.
[14] *See In re: Blue Cross Blue Shield Antitrust Litigation*, 308 F. Supp. 3d at 1274.

## II.     FACTS CONCERNING THE CLAIMS AT ISSUE

50.     <u>Patient 1 – Admitted and Discharged in 2021</u>:[15] At the time services were rendered, Patient 1 was a 36-year-old male with a history of progressive bilateral lower extremity weakness, difficulty walking, falls, and hypertension. Patient 1 presented to the emergency room at Alaska Regional on Saturday, November 27, 2021, unable to walk with worsening bilateral lower extremity weakness, numbness, and tingling, hypertension, and visual and audible hallucinations. After being examined in the Emergency Department, Patient 1 was admitted as an inpatient for further evaluation. A neurology consultation resulted in a lumbar puncture, which was clear, odorless, and contained no visible organisms. Alaska Regional's physical therapy and occupational therapy teams evaluated Patient 1 and determined he should be discharged to an inpatient-rehab facility ("IRF"). Patient 1 could not be safely discharged from Alaska Regional until his placement was secured at an IRF because of the level of care Patient 1 required.

51.     Patient 1 presented to the emergency department at Alaska Regional with Highmark insurance coverage. Highmark authorized the first five days of Patient 1's inpatient admission and began denying authorization as of day 6 and forward for a purported lack of medical necessity. During Patient 1's admission, Alaska Regional worked diligently to arrange Patient 1's discharge to an IRF as ordered by his physician and sent referrals for placement. An IRF requested Patient 1's updated physical therapy and occupational therapy notes on the seventh day of his admission, which were provided by Alaska Regional. On the eight day of Patient 1's admission, the IRF submitted a request to insurance for possible admission mid-week. Two days later, the IRF accepted Patient 1, and Alaska Regional discharged Patient 1 to the IRF.

---

[15] The Subscribers at issue in this Complaint have been de-identified in accordance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

52.    On December 15, 2021, the claim for services provided by Alaska Regional to Patient 1 was timely submitted electronically to PremeraFirst for forwarding to Highmark. On January 6, 2022, representatives of Alaska Regional were advised the claim was received on December 15, 2021 and forwarded to CERIS, a third-party vendor that performs pre-payment reviews, on December 16, 2021. The PremeraFirst representative advised Alaska Regional to fax CERIS an itemized bill for the services rendered to Patient 1 directly. On January 17, 2022, a representative form CERIS confirmed CERIS received the itemized bill for Patient 1 on January 10, 2022. On February 23, 2022, via electronic remittance, Alaska Regional received partial payment for the services rendered to Patient 1. The payment did not fully reimburse the contracted rates set forth in the PremeraFirst Provider Agreement for the authorized portion of the stay and payment was fully denied for the six denied days.

53.    On or about March 28, 2022 a first-level appeal was timely submitted to PremeraFirst for forwarding to Highmark, enclosing a copy of Patient 1's medical records, and requesting medical necessity review. On May 4, 2022, Alaska Regional received correspondence dated April 15, 2022, from Highmark advising the appeal was denied on the grounds that Patient 1 was stable for discharge to an IRF on December 8, 2021; therefore, his continued stay at Alaska Regional was purportedly not supported. On June 1, 2022, Alaska Regional received correspondence dated May 12, 2022, from PremeraFirst, advising Highmark had reviewed and denied the appeal on April 4, 2022.

54.    On or about May 10, 2022, a second-level appeal was submitted timely to PremeraFirst for forwarding to Highmark, enclosing a copy of Patient 1's medical records, and requesting medical necessity review. On June 28, 2022, Alaska Regional received correspondence from PremeraFirst dated June 20, 2022, advising Highmark said that the claim for services

17

rendered to Patient 1 was not eligible for a second-level appeal because all provider appeal options had been exhausted.

55.    The failure to pay the contracted rate of payment and denial of Alaska Regional's claim for services rendered to Patient 1 as not medically necessary and/or not authorized constitutes a wrongful denial of benefits and should be reversed.

56.    First, under the PremeraFirst Agreement and state and federal law, Alaska Regional is not required to obtain prior authorization for emergency services provided to patients. *See* 29 C.F.R. § 2590.715-2719A (eff. Sept. 13, 2021); 3 AAC 28.914; 40 Pa. Stat. Ann. § 991.2116. Patient 1 presented through Alaska Regional's emergency department while experiencing a medical emergency. Furthermore, Alaska Regional timely provided notification of admission to Highmark and requested authorization for the entirety of Patient 1's stay. Highmark partially authorized Patient 1's stay and improperly denied authorization for the remainder of the stay. Patient 1 could not be safely discharged since there were no IRF beds available for transfer. Patient 1 continued to receive care and treatment at Alaska Regional until a bed became available at an IRF, and authorization for IRF services was granted by Highmark, and Patient 1 was safely transferred. Once an IRF bed became available Highmark delayed the authorization for IRF services. Patient 1 was transferred immediately upon an accepting IRF having an available bed and received authorization from Highmark.

57.    Second, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark is required to pay under Alaska, Pennsylvania, and federal law. *See* 29 C.F.R. § 2590.715-2719A; 3 AAC 28.914; 40 Pa. Stat. Ann. § 991.2116.

58.    Third, the services provided by Alaska Regional to Patient 1 were medically necessary, as evidenced by Patient 1's medical records. Further at least three days of the non-

authorized portion of Patient 1's inpatient admission met InterQual criteria.[16] Patient 1 required an inpatient level of care while he awaited transfer to an IRF, but Patient 1's discharge from Alaska Regional was hampered by a lack of available IRF beds and Highmark's failure to timely authorize his placement at an IRF. Alaska Regional could not safely discharge Patient 1 until his placement at an IRF was arranged. Discharging without a safe discharge plan is prohibited by federal law. *See* 42 CFR § 482.43 (eff. Jan. 1, 2025). Under the PremeraFirst Agreement, Highmark is prohibited from denying payment for inpatient days incurred because of its own failure to authorize placement.

59.    In summary, Alaska Regional provided medically necessary, covered services to Patient 1 and is entitled to payment in full for those services. According to the terms of PremeraFirst Agreement, Alaska Regional is entitled to be paid an additional $26,337.44 for the medically necessary, covered services provided to Patient 1.

60.    <u>Patient 2 – Admitted in 2021 and Discharged in 2022</u>: At the time services were rendered, Patient 2 was a 53-year-old female with a history of diabetes and a recent positive COVID-19 test. Patient 2 presented to the emergency room at Rose on Thursday, December 30, 2021, with shortness of breath, fever, headache, and cough. After being examined in the emergency department, Patient 2 was admitted as an inpatient for further evaluation and treatment.  Patient 2's room air oxygenation saturation (o2 sat) was 80%, which improved to 95% once placed on 4L of oxygen via a nasal cannula. Patient 2's chest x-ray revealed multifocal pneumonia. While admitted as an inpatient at Rose, Patient 2 received COVID-19 targeted therapies. Patient 2's oxygen demands increased over the course of her six-day inpatient stay and she required up to 15L

---

[16] InterQual criteria are guidelines used by health plans and healthcare providers as a tool to evaluate the appropriate level of care (inpatient, observation, or outpatient) for hospitalized patients. The guidelines are not determinative of medical necessity and are not a substitute for the professional medical judgment of a treating physician.

of oxygen. During her admission, Patient 2 developed acute respiratory distress syndrome and was unable to be fully weaned off of oxygen during her stay. After continued close medical management, Patient 2 was discharged home with follow-up, prescriptions, and home oxygen.

61.    Patient 2 presented to the emergency room at Rose with Highmark insurance coverage. Rose submitted Patient 2's clinical records to Highmark on January 3, January 5, January 6, and January 10, 2022, and made multiple attempts to obtain authorization from Highmark.

62.    On January 19, 2022, the claim for services provided by Rose for Patient 2 was timely submitted electronically to Highmark. On February 1, 2022, Highmark fully denied payment for Patient 2's inpatient admission for a purported lack of medical necessity.

63.    On or about February 23, 2022, a first-level appeal was submitted timely to Anthem CO for forwarding to Highmark, enclosing a copy of Patient 2's medical records and requesting a medical necessity review. On March 24, 2022, through Anthem CO's online portal, Rose was advised that the first-level appeal had been received on March 7, 2022, was sent for review on March 15, 2022, and was further advised that an additional 30 to 45 calendar days were needed to complete the review. On March 31, 2022, a Rose representative spoke with an Anthem CO representative who advised that Highmark upheld its denial based upon a purported lack of medical necessity.

64.    On or about April 4, 2022 a second-level appeal was submitted timely to Anthem CO for forwarding to Highmark, enclosing a copy of Patient 2's medical records and requesting a medical necessity review. On May 2, 2022, Rose learned through the web portal used by Anthem CO that the second-level appeal was received on April 19, 2022, and the appeal was under review. On June 3, 2022, Anthem CO, through its web portal, informed Rose that the medical records enclosed with the second-level appeal were for the wrong patient. On June 14, 2022, Rose

resubmitted the second-level appeal with Patient 2's medical records. On August 9, 2022, Rose spoke with a Highmark representative who stated that the second-level appeal was received on July 11, 2022. The Highmark representative further stated Highmark closed the second-level appeal on July 15, 2022, because it was a "duplicate of the first level" appeal.

65.    Highmark's failure to pay the contracted rate of payment continued denial of Rose's claim for services rendered to Patient 2 as not medically necessary constitutes a wrongful denial of benefits and should be reversed.

66.    First, under the Anthem CO Agreement and state and federal law, Rose is not required to obtain prior authorization for emergency services provided to patients. *See* 29 C.F.R. § 2590.715-2719A; Colo. Rev. Stat. § 10-16-704; 40 Pa. Stat. Ann. § 991.2116. Patient 2 presented through Rose's emergency department while experiencing a medical emergency. Furthermore, Rose timely requested authorization for the entirety of Patient 2's stay and Highmark never responded during the pendency of Patient 2's stay.

67.    Second, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark is required to pay under Colorado, Pennsylvania, and federal law. *See* Colo. Rev. Stat. § 10-16-704; 40 Pa. Stat. Ann. § 991.2116; 42 CFR § 438.114 (eff. Jul. 5, 2016).

68.    Third, the services provided by Rose to Patient 2 were medically necessary, as evidenced by Patient 2's medical records. Further, Patient 2's entire inpatient admission met InterQual criteria. Under the Anthem CO Agreement, Highmark is prohibited from denying payment for medically necessary, covered services.

69.     In summary, Rose provided medically necessary care to Patient 2 and is entitled to payment in full for those services. According to the terms of the Anthem CO Agreement, Rose is entitled to be paid $40,531.16 for the medically necessary, covered services provided to Patient 2.

70.     <u>Patient 3 – Procedure Performed in 2022:</u> At the time services were rendered, Patient 3 was a 42-year-old female with a history of morbid obesity, a body mass index over 40, polycystic ovarian syndrome, metabolic syndrome, and obstructive sleep apnea. Patient 3 experienced obesity as a long-term problem with progressive severity over her adult life. Patient 3 attempted weight loss multiple times without long-term success. Patient 3's physician determined she was an appropriate candidate for bariatric surgery due to her history of morbid obesity and co-morbidities. Accordingly, Patient 3 presented at Rose for a laparoscopic sleeve gastrectomy, which was performed without complications. Patient 3 was admitted as an inpatient following the procedure for post-operative management. By the next day, Patient 3 tolerated oral nutrition, had adequate pain management, and received clearance from Rose's physical therapy team. Patient 3 was discharged home with prescriptions and follow-up one day after her procedure in stable condition.

71.     Patient 3 presented at Rose with insurance through Highmark. Rose faxed Patient 3's clinical documentation to Highmark on August 17, 2022. On August 18, 2022, Highmark denied authorization for the procedure due to a purported lack of medical necessity. On August 21, 2022, the claim for services provided by Rose to Patient 3 was timely submitted electronically to Anthem CO for forwarding to Highmark. September 7, 2022, Rose received a denial from Highmark, fully denying the medical services provided to Patient 3 due to a purported lack of medical necessity.

72.     On or about September 19, 2022, a first-level appeal was timely submitted to Anthem CO for forwarding to Highmark, enclosing a copy of Patient 3's medical records, and requesting a medical necessity review. On November 7, 2022, via its online portal, Anthem CO requested Rose resubmit Patient 3's medical records.  On December 12, 2022, Rose resubmitted Patient 3's medical records to Anthem CO. Between January 3, 2023 and February 6, 2023, Rose received confirmation from Anthem CO on three separate occasions, through its online portal, that the appeal was under review. On February 20, 2023, Rose received notice from Anthem CO, through its online portal, that as of January 30, 2023, Highmark had upheld its denial based upon a purported lack of medical necessity.

73.     Highmark's failure to pay the contracted rate of payment and continued denial of Rose's claim for services rendered to Patient 3 as not medically necessary constitutes a wrongful denial of benefits and should be reversed.

74.     The services provided by Rose to Patient 3 were medically necessary, as evidenced by Patient 3's medical records and supported by the fact that Patient 3's procedure met InterQual inpatient level of care criteria and Centers for Medicare & Medicaid Service's ("CMS") Addendum E requirements, which categorize Patient 3's procedure as an inpatient only surgery. Highmark is obligated to pay for medically necessary, covered services under the Anthem CO Agreement.

75.     In summary, Rose provided medically necessary care to Patient 3 and is entitled to payment in full for those services. According to the term of the Anthem CO Agreement, Rose is entitled to be paid $36,769.19 for the medically necessary, covered services provided to Patient 3.

76.     Patient 4 – Admitted and Discharged in 2023: At the time services were rendered, Patient 4 was a 64-year-old female with a history of relapsing central nervous system (CNS) lymphoma, brain lesions, right-sided weakness and numbness, and diffuse large B-cell lymphoma.

Patient 4 was referred directly to St. Luke's emergency room on Wednesday, December 6, 2023, by her oncologist after an outpatient MRI confirmed enhancing brain lesions in the left frontal lobe bilateral vitreoretinal lymphoma (PVRL) involvement primary central nervous system lymphoma (PCNSL) with progressive right-sided weakness and paraplegia. After being examined in the emergency room, Patient 4 was admitted for treatment including orders by her oncologist for inpatient chemotherapy initiation cycle one of DA-R-TEDDI on 12/6/2023 and radiation complex simulation consultation due to relapsing diffuse large B-cell lymphoma. Patient 4 received dose adjusted R-TEDDI cycle 1 day 1 on December 6, 2023, cycle 1 day 8 was completed on December 13, 2023, the date Patient 4 was discharged. Patient 4's physician planned two cycles of dose adjusted R-TEDDI followed by an auto stem cell transplant. Patient 4 also had leukocytosis due to Neulasta.

77.    Patient 4 presented to the emergency room at St. Luke's with Highmark insurance coverage. On or about December 6, 2023, St. Luke's faxed Patient 4's notification of admission to Highmark. Between December 8, 2023 and January 2, 2024, a representative of St. Luke contacted Quantum[17] and spoke with representatives at least six times. During each conversation, the Quantum representative stated that a decision on authorization remained pending. On January 2, 2024, St. Luke's received a voicemail from a Quantum representative who stated authorization was denied as experimental and investigational. On January 6, 2024, the claim for services provided by St. Luke's to Patient 4 was timely submitted electronically to Highmark. On January 17, 2024, St. Luke's received a denial from Highmark, fully denying the claim for medical services provided to Patient 4 due to a purported lack of medical necessity.

---

[17] Upon information and belief, Quantum is a third-party that performs pre-authorization review for Highmark.

78.     On or about January 25, 2024, a first-level appeal was timely submitted to Anthem CO for forwarding to Highmark, enclosing a copy of Patient 4's medical records, and requesting a medical necessity review. On February 16, 2024, through Anthem CO's online portal, a representative of St. Luke's was advised that Highmark had upheld the denial based upon a purported lack of medical necessity.

79.     On or about February 23, 2024, a second-level appeal was submitted timely to Anthem CO for forwarding to Highmark, enclosing a copy of Patient 4's medical records, and requesting a medical necessity review. On March 12, 2024, a representative of St. Luke's spoke with an Anthem CO representative who advised the second-level appeal was pending with Highmark as of March 11, 2024. Between March 19, 2024 and April 29, 2024, representatives of St. Luke's contracted Anthem CO representatives at least nine times either via telephone or Anthem CO's online portal. Throughout this time, Anthem CO maintained the appeal was under review. On May 2, 2024, a representative of St. Luke's corresponded with an Anthem CO representative, via Anthem CO's online portal, who confirmed Highmark upheld the denial of the claim.

80.     Highmark's failure to pay the contracted rate of payment and continued denial of St. Luke's claim for services rendered to Patient 4 as experimental and investigational/not medically necessary constitutes a wrongful denial of benefits and should be reversed. Patient 4's treatment plan included DA-R-TEDDI, which is Dose Adjusted, Rituximab (immunotherapy), Temozolomide (chemotherapy), Etoposide (chemotherapy), Doxil (liposomal doxorubicin – chemotherapy), Dexamethasone (steroid), Ibrutinib (targeted therapy/BTK inhibitor). DA-TEDDI-R is a specialized, high-intensity chemotherapy-immunotherapy regime developed by the National Cancer Institute to treat primary PCNSL and secondary CNS lymphoma. Studies have

shown high response rates, around 86% in some studies, with many patients achieving complete remission.

81.    First, under the Anthem CO Agreement and state and federal law, St. Luke's is not required to obtain prior authorization for emergency services provided to patients. Patient 4 presented through St. Luke's emergency department while experiencing a medical emergency. *See* 29 C.F.R. § 2590.715-2719A; Colo. Rev. Stat. § 10-16-704; 40 Pa. Stat. Ann. § 991.2116. Furthermore, St. Luke's timely notified Highmark of Patient 4's admission and Highmark failed to respond to the request for authorization for the entirety of Patient 4's stay and did not respond until 27 days after the initial request despite St. Luke's multiple requests for a determination.

82.    Second, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark is required to pay under Colorado, Pennsylvania, and federal law. *See* Colo. Rev. Stat. § 10-16-704; 40 Pa. Stat. Ann. § 991.2116; 42 CFR § 438.114.

83.    Third, the services provided by St. Luke's to Patient 4 were medically necessary, as evidenced by Patient 4's medical records. Patient 4 required an inpatient level of care to receive the necessary chemotherapy and immunotherapy and further testing to confirm the appropriate treatment plan.

84.    In summary, St. Luke's provided medically necessary care to Patient 4 and is entitled to payment in full for those services. According to the terms of the Anthem CO Agreement, St. Luke's is entitled to be paid $75,910.74 for the medically necessary, covered services provided to Patient 4.

85.    <u>Patient 5 – Admitted and Discharged in 2022</u>: At the time services were rendered, Patient 5 was a 48-year-old female with a history of paraoesophageal hernia repair, hepaticojejunostomy, and antrectomy with gastrojejunostomy. Patient 5 presented to the

emergency room at Memorial with severe abdominal pain and constipation. Imaging of Patient 5's abdomen revealed dilated loop of large bowel in right hernia abdomen raising concern for sigmoid volvulus. After being examined in the emergency department, Patient 5's was admitted as an inpatient due to imaging findings and for further evaluation. Patient 5 underwent an emergency exploratory laparotomy with right hemicolectomy and ileocolostomy anastomosis, closure of hernia defects, revision of gastrojejunal anastomosis, and open gastrotomy tuber placement. Following the surgery, Patient 5 was placed in critical care due to low blood pressure.

86.    Through Patient 5's admission, she underwent two additional laparotomies due to (1) an ischemic bowel resulting in a small bowel resection and application of abthera and (2) ileocolonic anastomotic resection with end ileostomy. After eight days in the intensive care unit and twenty-one days in post-intensive care, Patient 5 was transferred to a lower level of care because she was stable and frequently received adjustments to her diet. Patient 5 continued to improve, until 17 days later, Memorial staff found her unresponsive with a fever and ordered a stroke workup. Patient 5 returned to the post-intensive care unit where she received intravenous fluids with improvement in symptoms and a blood transfusion packed with red blood cells for decreasing hemoglobin. Patient 5 was discharged home with home health support after 51 days of inpatient care at Memorial.

87.    Patient 5 presented to the emergency room at Memorial Highmark insurance coverage. On June 14, 2022, Memorial provided Patient 5's clinical information via fax to Quantum. On June 15, 2022, Quantum authorized two inpatient days, setting the next date for review on June 16, 2022. On June 17, 2022, Quantum authorized four additional inpatient days. Over the next several weeks, Memorial provided updated clinical information to Quantum and ultimately Quantum approved all inpatient days through July 14, 2022.  On July 29, 2022,

Memorial received a voicemail from a Quantum representative advising they were denying all inpatient days for Patient 5 after July 14, 2022. On August 1, 2022, Patient 5's physician requested a peer to peer with Quantum. The peer to peer between Memorial's physician and Quantum's physician was conducted on August 2, 2022. Memorial contacted Quantum at least four times between August 3, 2022, and August 8, 2022, requesting an update on the peer-to-peer decision. On August 8, 2022, Quantum advised Memorial that the denial was being upheld and Patient 5's inpatient stay after July 14, 2022, remained denied. A denial letter dated July 29, 2022, stated Patient 5.'s care from July 14, 2022, forward could have been handled at a lower level of care.

88.    Memorial worked diligently to secure placement for Patient 5 for her upcoming discharge. Initially, Memorial planned to discharge Patient 5 to an IRF, but Patient 5 requested home health support upon discharge. Patient 5 was accepted to home health, and Memorial case management began setting up additional durable medical equipment, tube feedings, and wound vac for home health. Patient 5 continued to experience health complications while admitted and agreed to allow Memorial to send referrals to additional long term acute care hospitals ("LTACH"). An LTACH initiated an authorization request on July 19, 2022, but Highmark denied authorization on July 22, 2022. Memorial continued to send home health referrals until Patient 5 was accepted to home health on August 2, 2022. Patient 5 was discharged from Memorial on August 4, 2022.

89.    On August 9, 2022, the claim for services by Memorial to Patient 5 was timely submitted electronically to Highmark. On August 26, 2022, via electronic remittance, Memorial received a full denial for services rendered to Patient 5, stating "[p]recertification/authorization/notification absent." Memorial rebilled the claim on September 7, 2022, and again on September 27, 2022—this time splitting the bill to account for the authorized dates of service and the unauthorized dates of service. On October 13, 2022, Highmark denied the

claim for the authorized dates of service, stating again "[p]recertification/ authorization/notification absent." On October 18, 2022, Memorial rebilled the claim pertaining to the unauthorized dates of service. On October 31, 2022, a representative of Memorial spoke with an Anthem GA representative via telephone who stated that Anthem GA noted the authorization and would send the claim with authorization back to Highmark for escalation. On November 1, 2022, Highmark again denied the claim for the authorized dates of service, stating "[p]recertification/authorization/notification absent."

90.    On or about November 17, 2022, medical records, a UB04, and a Request for Review form was submitted to Anthem GA because Anthem GA pended the claim for additional information to determine medical necessity. On December 23, 2022 Memorial received payment for the authorized portion of Patient 5's claim in the amount of $183,116.68 from Highmark.

91.    On or about January 20, 2023, a first-level appeal was submitted timely to Anthem GA for forwarding to Highmark, enclosing a copy of Patient 5's medical records, and requesting a medical necessity review for the portion of Patient 5's stay that was denied. Between February 16, 2023 and April 26, 2023, Memorial contacted Anthem GA numerous times. Through the Anthem CA online portal communications, Memorial was able to confirm that (1) Anthem GA forwarded the first-level appeal to Highmark on February 16, 2023 and (2) Highmark confirmed it sent the first-level appeal to Quantum for review on March 17, 2023. On June 12, 2023, Memorial received fax correspondence from Quantum indicating the denial for Patient 5's inpatient care from July 14, 2022, through August 4, 2022, was upheld.

92.    The failure to pay the contracted rate of payment and partial denial of Memorial's claim for services rendered to Patient 5 as not medically necessary and/or not authorized from July 14, 2022 through August 4, 2022 constitutes a wrongful denial of benefits and should be reversed.

93.     First, under the Anthem GA Agreement and state and federal law, Memorial is not required to obtain prior authorization for emergency services provided to patients. *See* Ga. Comp. R. & Regs. 120-2-106-.05; 40 Pa. Stat. Ann. § 991.2116; 29 C.F.R. § 2590.715-2719A.  Patient 5 presented through Memorial's emergency department while experiencing a medical emergency. Furthermore, Memorial timely provided notification of admission to Highmark and requested authorization for the entirety of Patient 5's stay, which Highmark partially authorized and improperly denied authorization for the remainder of Patient 5's admission. Highmark did not timely respond to Memorial's request for authorization before denying dates of service July 14, 2022 – August 4, 2022.  Memorial requested continued authorization on July 14, 2022, and was advised on July 29, 2022, over two weeks later, that the days were denied. Memorial also requested a peer to peer and did not receive that decision timely. The peer to peer was held on August 2, 2022, Highmark did not advise Memorial of the decision until August 8, 2022, six days later.

94.     Second, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark is required to pay under Georgia, Pennsylvania, and federal law. *See* Ga. Comp. R. & Regs. 120-2-106-.05; 40 Pa. Stat. Ann. § 991.2116; 42 CFR § 438.114.

95.     Third, the services provided by Memorial to Patient 5 were medically necessary, as evidenced by Patient 5's medical records. Further, at least three days of the non-authorized portion of Patient 5's inpatient admission met InterQual criteria. Patient 5 required an inpatient level of care while she awaited transfer to an LTACH and, later, to home health because Highmark denied her transfer to an LTACH. Patient 5's discharge from Memorial was hampered by Highmark's LTACH denial and availability of home health resources in Highmark's network. Memorial could not safely discharge Patient 5 until home health was arranged. Discharging without a safe discharge

plan is prohibited by federal and state law. *See* 42 CFR § 482.43; Ga. Comp. R. & Regs. 111-8-40-.20. Under the Anthem GA Agreement, Highmark is prohibited from denying payment for inpatient days incurred due to unavailability of network/participating providers.

96.     In summary, Memorial provided medically necessary care to Patient 5 and is entitled to payment in full for those services. According to the terms of the Anthem GA Agreement, Memorial is entitled to be paid an additional $43,249.96 for the medically necessary, covered services provided to Patient 5.

<u>**CAUSES OF ACTION**</u>

**COUNT I – BREACH OF CONTRACT (PROVIDER AGREEMENTS)**

97.     The foregoing paragraphs are incorporated by reference.

98.     As alleged above, Plaintiffs are parties to the Provider Agreements, which provide the terms and conditions under which Plaintiffs will treat subscribers with BCBS health plans and be reimbursed for that treatment.

99.     With respect to claims processed by the Local Plans for Highmark under the BlueCard Program, as set forth above, Highmark is an "Affiliate," "Other Payor," and/or "Plan" under the Provider Agreements, and as expressly provided in the Provider Agreements, Highmark is bound by the terms of the Provider Agreements, including their payment terms.

100.     The Provider Agreements bind the Local Plans and any "Affiliate," "Other Payor," and/or "Plan," which includes entities accessing the terms of the Provider Agreements pursuant to an agreement with the Local Plans, including other BCBS plans.

101.     The definition of "Affiliate" in the Anthem CO Agreement and Anthem GA Agreement expressly includes Highmark, and the Anthem CO Agreement and Anthem GA Agreement provide that "Affiliates" are required to reimburse St. Luke, Rose, and Memorial in

accordance with the payment provisions and at the rates set forth in the Anthem CO and Anthem GA agreement when they access the Anthem CO Agreement and Anthem GA Agreement through the BlueCard Program.

102.    The definitions of "Other Payor" in the Anthem CO Agreement and Anthem GA Agreement and "Plan" in the PremeraFirst Agreement include participants in the BlueCard Program, like Highmark, because under the BlueCard Program, Highmark is another BCBS plan accessing the terms of the Provider Agreements. Upon information and belief, Highmark enters into contracts with the Local Plans and/or the BCBSA concerning participation in the BlueCard Program, which should be construed as one contract with Plaintiffs' Provider Agreements with the Local Plans.

103.    The Anthem CO Agreement and Anthem GA Agreement provide that when "Other Payors" access the services and rates in the Anthem CO Agreement and Anthem GA Agreement, "Other Payors" become a "Plan" responsible for paying for services provided to their subscribers at the rates set forth in the Anthem CO Agreement and Anthem GA Agreement. Under the Anthem CO Agreement and Anthem GA Agreement, "Other Payors" are bound by the terms of the Anthem CO Agreement and Anthem GA Agreement, including their payment terms, to the same extent as Anthem CO and Anthem GA.

104.    Similarly, under the PremeraFirst Agreement, "Plans" are bound by the terms of the PermeraFirst Agreement, including its payment terms, to the same extent as PremeraFirst.

105.    Highmark's acknowledgement of its financial responsibility for the claims is supported by correspondence, authorizations, and partial payments received from Highmark for the Subscribers, as well as by the fact that, upon information and belief, the Home Plan accounts

for payments made for claims processed under the BlueCard Program as expenses on its federal taxes.

106.    Highmark's intent to be bound by and agreement to the terms of the Provider Agreements is also demonstrated by representations made by Highmark to its subscribers and to providers. Specifically, Highmark represents that Hospitals are "in-network" with Highmark through the BlueCard Program, which means that Highmark is considered contracted with the Hospitals through the Provider Agreements between the Hospitals and Local Plans. Further, Highmark also represents in its BlueCard Program FAQs that the Home Plan (here, Highmark) is responsible for adjudicating claims for services provided to subscribers based on the subscribers' benefits and the providers' agreement with the local BCBS plan (here, the Provider Agreements between the Local Plans and Hospitals).

107.    Additionally, upon information and belief, the BlueCard program operates by all individual state licensees of the BCBSA entering into contracts with one another and/or with the BCBSA that allow licensees, such as Highmark, nation-wide access to in-network reimbursement rates of other BCBS health plans, such as the Local Plans, for the licensees' members who receive medical services while living or traveling outside of the geographic boundaries of the Home Plan. In fact, upon information and belief, each licensee must make its in-network rates available to all other BCBS-branded plans. The Host Plan, upon information and belief, charges the Home Plan an access fee for access to the local rates and an administrative fee for processing claims. In effect, these nation-wide contracts provide a means by which individual licensees of the BCBSA, such as the Local Plans, assign their rights and locally negotiated payment rates under contracts with health care providers, such as Plaintiffs, to other licensees of the BCBSA, such as Highmark, thus allowing those licensees access to in-network rates, including the substantial in-network discounts

off of billed charges built into such rates. The assigning BCBSA licensee, which in this case are the Local Plans, then acts as the claims administrator and forwards the claims to the Home Plan, which in this case is Highmark, for final determination and payment.

108.    Under this arrangement, the BlueCard Program is essentially a rental network, and when there are multiple contracts between multiple parties in the rental network context, the agreements may be construed as one contract between the multiple parties.

109.    In this case, the Provider Agreements between the Plaintiffs and the Local Plans and any agreement between the Local Plans and Highmark, whether direct or indirect through the BCBSA, should be construed as one contract, such that Highmark is bound by the terms of the Local Plans' Provider Agreements with the Hospitals, to which Highmark has assented and agreed.

110.    Highmark knew that by participating in the BlueCard Program with the Local Plans that it would be bound by the terms of the Local Plans' contracts with their local providers, like Plaintiffs, which is evidenced by the Provider Agreements' express references to "Affiliates," "Other Payors," and/or "Plans" being bound by the terms of the Provider Agreements, and upon information and belief by the terms of Highmark's License Agreement with BCBSA.

111.    Accordingly, there was a meeting of the minds between Plaintiffs and Highmark as to the binding nature of the Provider Agreements, as well as the material terms of the Provider Agreements as they relate to all parties, including the rates of payment in the Provider Agreements.

112.    Highmark received consideration for the Provider Agreements because Plaintiffs provided medically necessary, covered services to the Subscribers; assisted Highmark in meeting its obligations to arrange for timely medical care to its Subscribers; Highmark accessed negotiated, discounted in-network rates for the services provided to its Subscribers; and Highmark received

and retained premiums from the Subscribers in connection with the services provided including BlueCard services.

113.    Under the Provider Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary, covered services to a subscriber.

114.    Plaintiffs provided medically necessary, covered services to each of the Subscribers, and those services are payable under the terms of the Provider Agreements. Highmark consented to and received the benefit of the services and the discounted rates for the services and agreed to pay for such services at the rates set forth in the Provider Agreements by virtue of its participation in the BlueCard Program.

115.    Highmark breached the Provider Agreements by failing to pay in full for the medically necessary, covered services Plaintiffs provided to the Subscribers described above.

116.    Plaintiffs suffered damages as a direct and proximate result of Highmark's breach of the Provider Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $222,798.49 under the Provider Agreements for the medically necessary, covered services that Plaintiffs provided to Highmark's Subscribers.

### COUNT II – BREACH OF CONTRACT (LICENSE AGREEMENT)

117.    The foregoing paragraphs are incorporated by reference.

118.    Upon information and belief, in Highmark's License Agreement with the BCBSA, Highmark promises that it will ensure compliance with the terms and conditions of the BlueCard Program, including its payment terms. Upon information and belief, Highmark even promises to arrange for a guarantor of its payment obligations arising under the BlueCard Program.

119.    Upon information and belief, the terms and conditions of the BlueCard Program incorporated by reference into the License Agreement state that Home Plans must reimburse

providers at the rates set forth in the providers' contracts with Host Plans for BlueCard claims. Highmark, upon information and belief, expressly consented to these reimbursement terms when it entered into the License Agreement.

120.     Upon information and belief, Highmark and the BCBSA intended for the License Agreement's provisions requiring Highmark to ensure that BlueCard claims are paid correctly, to benefit providers, such as Plaintiffs.

121.     Upon information and belief, by incorporating the BlueCard Program terms and conditions into the License Agreement and obligating Highmark to comply with them, both Highmark and the BCBSA expressed a clear intention for the providers (here, Plaintiffs), who render services to Highmark's subscribers under the BlueCard Program to receive the benefit of payment by the Home Plan (Highmark) at the rates set forth in the Host Plan's contract with the providers (the Provider Agreements between Plaintiffs and the Local Plans).

122.     Upon information and belief, the BCBSA (the promisee) obtained the promise from Highmark (the promisor) to reimburse the providers, including Plaintiffs (the beneficiaries) as consideration for granting Highmark use of BCBSA's licensed marks and names, with the intention that the reimbursement will benefit the providers and discharge BCBSA's obligation to ensure the integrity of the BlueCard Program and that participating providers are paid correctly.

123.     Under this arrangement, Plaintiffs are third-party beneficiaries of the License Agreement between Highmark and BCBSA.

124.     By failing to reimburse Plaintiffs at the rates set forth in the Provider Agreements, as required by the terms and conditions of the BlueCard Program incorporated into the License Agreement, Highmark breached the License Agreement.

36

125.    As a third-party beneficiary entitled to the benefits of the License Agreement, Plaintiffs have standing to assert a claim for breach of the License Agreement and to obtain the benefits to which they are entitled thereunder (i.e., reimbursement in accordance with the terms of the BlueCard Program).

126.    Plaintiffs suffered damages as a direct and proximate result of Highmark's breach of the License Agreement; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $222,798.49 as third-party beneficiaries of the License Agreement for the medically necessary, covered services that Plaintiffs provided to Highmark's Subscribers and for which Plaintiffs are entitled to be reimbursed in accordance with the terms and conditions of the BlueCard Program.

## COUNT III – BREACH OF IMPLIED-IN-FACT CONTRACT

127.    The foregoing paragraphs are incorporated by reference except to the extent they allege the existence, validity, or enforceability of an express contract, which allegations are pled solely in the alternative.

128.    Alternatively, if Highmark is not bound to reimburse Plaintiffs by the terms of the Provider Agreements as an "Affiliate," "Other Payor," and/or a "Plan" responsible for payment of the claims, or by the License Agreement, Plaintiffs are entitled to be reimbursed for the services provided to the Subscribers pursuant to an implied-in-fact contract existing between Plaintiffs and Highmark by reason of Highmark's participation in the BlueCard Program.

129.    As participants in the BlueCard Program, Plaintiffs and Highmark impliedly agreed and understood that: (1) Plaintiffs would provide services to Highmark's subscribers, (2) Plaintiffs would submit claims to the Local Plans, Highmark's agents, for forwarding to Highmark for

services provided to the subscribers, and (3) Highmark would reimburse Plaintiffs at the rates specified in Plaintiffs' Provider Agreements with the Local Plans.

130.    By participating in the BlueCard Program, Highmark, as an "Affiliate," "Other Payor," and/or "Plan" was obligated to reimburse Plaintiffs at the rates set forth in the Provider Agreements, even if Highmark was not a signatory to the Provider Agreements.

131.    Highmark's intent to be bound by an implied-in-fact contract with Plaintiffs is also evidenced by Highmark's conduct. Highmark participated in the adjudication of these claims, communicated with Plaintiffs regarding the claims, authorized the care to be provided for some of the claims, reviewed and adjudicated appeals, and issued partial payments.

132.    Highmark's intent to be bound by an implied-in-fact contract with Plaintiffs is also demonstrated by the representations made by Highmark to its subscribers and providers. Specifically, Highmark represents that the Hospitals are "in-network" with Highmark through the BlueCard Program, meaning it has a contract with Plaintiffs. Further, Highmark also represents in its BlueCard Program FAQs that the Home Plan is responsible for adjudicating claims for services provided to subscribers based on the subscribers' benefits and the providers' agreement with the local BCBS plan. Upon information and belief, Highmark makes similar representations in the License Agreement.

133.    Accordingly, there was a meeting of the minds between Plaintiffs and Highmark as to the binding nature of the implied-in-fact contract, as well as the material terms of the contract as they relate to both parties.

134.    Highmark received consideration for the implied-in-fact contract because Plaintiffs provided medically necessary, covered services to the Subscribers; assisted Highmark in meeting its obligations to arrange for timely medical care to its Subscribers; Highmark accessed negotiated,

discounted in-network rates for the services provided to its Subscribers; and received and retained premiums from the Subscribers in connection with the services provided.

135.    Plaintiffs and Highmark understood Highmark to be bound to reimburse Plaintiffs according to the terms of the Provider Agreements by reason of their participation in the BlueCard Program and by Highmark's own conduct and representations.

136.    In reliance on the implied-in-fact contract formed between Plaintiffs and Highmark by reason of their participation in the BlueCard Program, Plaintiffs provided medical services to Highmark's Subscribers with the expectation that Highmark would reimburse Plaintiffs for such services according to the terms of the Provider Agreements.

137.    By denying claims for services provided by Plaintiffs to Highmark's Subscribers, Highmark breached the implied-in-fact contract existing between Plaintiffs and Highmark.

138.    Plaintiffs have suffered damages as a direct and proximate result of Highmark's breach of the implied-in-fact contract; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $222,798.49 for the medically necessary, covered services Plaintiffs provided to Highmark's Subscribers.

### Count IV – PROMISSORY ESTOPPEL

139.    The foregoing paragraphs are incorporated by reference except to the extent they allege the existence, validity, or enforceability of an express contract, which allegations are pled solely in the alternative.

140.    Alternatively, even if Plaintiffs' breach of express or implied-in-fact contract claims fail, Plaintiffs are entitled to enforce Highmark's promises to reimburse them at the rates set forth in the Provider Agreements pursuant to the doctrine of promissory estoppel.

141.    Highmark knowingly participated in the BlueCard Program and, upon information and belief, promised in its License Agreement to comply with the terms and conditions of the BlueCard Program, including its obligation to reimburse providers, like Plaintiffs, at the rates set forth in the providers' contracts with the Host Plan (here, Plaintiffs' Provider Agreements with the Local Plans).

142.    Additionally, Highmark knowingly accessed the Provider Agreement as an "Affiliate," "Other Payor," and/or "Plan" by participating in the BlueCard Program, thereby promising to comply with the Provider Agreements' terms and conditions, including their payment terms.

143.    Highmark also agreed to comply with other provisions of the Provider Agreements by accessing their terms and negotiated rates under the BlueCard Program, including the Provider Agreements' provisions prohibiting Highmark from denying payment for claims it authorized, requiring authorization for emergency services, denying payment for unauthorized services that were nonetheless medically necessary, and denying payment for discharge delays that were not caused by any fault of the Hospitals. Highmark also represented the Plaintiffs as in-network providers having a contract with Highmark.

144.    Plaintiffs reasonably relied on Highmark's promises to comply with the terms of the BlueCard Program and its representations that Plaintiffs are in-network, and in reliance on Highmark's promises, Plaintiffs provided medical services to Highmark's Subscribers and submitted claims for which it reasonably expected to be paid at the rates in the Provider Agreements to Highmark.

145.    Highmark failed to reimburse Plaintiffs as required by the terms of the BlueCard Program and the Provider Agreements.

146.    Additionally, as set forth above, with respect to some Subscribers, Highmark denied claims based on reasons expressly prohibited by the Provider Agreements (such as improperly denying payment for claims it authorized, requiring authorization for emergency services, denying payment for unauthorized services that were nonetheless medically necessary, and denying payment for discharge delays), despite promising not to do so by reason of its assent to the Provider Agreements and its terms and conditions.

147.    It would be unjust to allow Highmark to represent to Plaintiffs through its various contractual promises that Plaintiffs would be paid at the rates set forth in the Provider Agreements and that it would not deny claims for certain prohibited reasons, allow Plaintiffs to provide medically necessary, covered services to the Subscribers in reliance on those promises, and then permit Highmark to deny payment to Plaintiffs. It would also be unjust to allow Highmark to represent that Plaintiffs are in-network providers, meaning contractual providers, and then not pay the contract rates. Highmark should be estopped from doing so.

148.    Plaintiffs have suffered damages as a direct and proximate result of Highmark's promises to reimburse Plaintiffs in accordance with the terms of the BlueCard Program and the Provider Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $222,798.49 for the medically necessary, covered services Plaintiffs provided to Highmark's Subscribers.

### COUNT V – QUANTUM MERUIT

149.    The foregoing paragraphs are incorporated by reference except to the extent they allege the existence, validity, or enforceability of an express contract, which allegations are pled solely in the alternative.

41

150. Alternatively, if Highmark is not bound to reimburse Plaintiffs by an express contract, implied-in-fact contract, or by the doctrine of promissory estoppel, Highmark is obligated to reimburse Plaintiffs for the reasonable value of the services provided to the Subscribers pursuant to the doctrine of quantum meruit.

151. Plaintiffs provided medically necessary, covered services to the Subscribers and are entitled to be reimbursed for the reasonable value of such services. Highmark benefited from Plaintiffs' services because Plaintiffs provided medically necessary, covered services to the Subscribers, including emergency medical services to some of the Subscribers, for which Highmark is obligated to pay under state and federal law; assisted Highmark in meeting its obligations to arrange for timely medical care to members; and received and retained premiums from the Subscribers in connection with the services provided.

152. Highmark also received the benefit of discounted rates for the medically necessary services Plaintiffs provided to its Subscribers by accessing the negotiated rates set forth in the Provider Agreements between PremeraFirst, Anthem CO, and Anthem GA and Plaintiffs.

153. Highmark was aware of these benefits, received such benefits and consented to such benefits, as Highmark received and sent correspondence concerning Plaintiff's provision of medically necessary, covered services to the Subscribers.

154. Highmark was also aware of the benefits it received because it was, at all relevant times, aware of its participation in and obligations under the BlueCard Program. Specifically, Highmark was aware that its Subscribers could receive and were receiving care at the Hospitals and that Highmark was obligated to pay for that care at the rates set forth in the Provider Agreements between PremeraFirst, Anthem CO, and Anthem GA and Plaintiffs as well as the terms of its Licensing Agreement

155.    Additionally, by allowing Highmark to access Plaintiffs' Provider Agreements with PremeraFirst, Anthem CO, and Anthem GA, Plaintiffs conferred the benefit of an expanded provider network and increased marketability upon Highmark. Specifically, Highmark advertises on its website that it is in-network with the Hospitals for the Subscribers' health plans. Highmark also advertises its participation in the BlueCard Program and describes it as a program that allows its members to receive "in-network" medical care nationwide. By participating in the BlueCard Program and by accessing the Agreement, Highmark is able to advertise in-network access to services at the Hospitals in Alaska, Colorado, and Georgia to its members, which undoubtedly constitutes a benefit to Highmark.

156.    The BCBSA, of which Highmark is a licensee, recognizes that the BlueCard Program results in increased subscriber enrollment for BCBSA licensees. Accordingly, each time a provider (here, Plaintiffs) agrees to provide "in-network" care to patients who are enrolled in BCBS health plans in other geographic service areas through the BlueCard Program, it enhances the marketability and potential subscriber enrollment of that BCBSA licensee (here, Highmark).

157.    The BCBSA has also recognized that the BlueCard Program confers multiple procompetitive benefits on BCBSA licensees, including "(i) access to high-quality insurance products with a local focus, broad provider networks, and competitive premiums; (ii) access to a nationwide patient volume for health care providers; and (iii) 'prompt payments, ease of claims processing[,] and lower administrative costs.'"[18]

158.    Any such procompetitive benefits can only be conferred upon BCBSA licensees, like Highmark, if providers, like Plaintiffs, agree to participate in the BlueCard Program by providing "in-network" care to patients with health benefits plans in other BCBS service areas and

---

[18] *See In re: Blue Cross Blue Shield Antitrust Litigation,* 308 F. Supp. 3d at 1274.

at in-network pricing such as provided here. In such cases, as here, the Plaintiffs confer these benefits upon Highmark when the Hospitals "participate" in the BlueCard Program in this way.

159.    Highmark accepted the benefits conferred upon it by Plaintiffs, knowing that the services were being provided under the BlueCard Program and knowing that Plaintiffs expected to be reimbursed for the services provided at the rates set forth in the Provider Agreements. Highmark, however, failed to reimburse Plaintiffs for the services provided to its Subscribers.

160.    Highmark should be obligated to reimburse Plaintiffs for the reasonable value of the services provided to the Subscribers, as it would be unjust for Highmark to knowingly receive a multitude of benefits from Plaintiffs' treatment of the Subscribers under the BlueCard Program without reimbursing Plaintiffs for such services at the reasonable rates set forth in the Provider Agreement.

## **DEMAND OF JURY TRIAL**

161.    Plaintiffs respectfully demand trial by jury on each of their claims for relief which are so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that the Court enter judgment against Defendant as follows:

1.    The amount due under the Provider Agreements and License Agreement; and

2.    For such other and further relief at the Court deems just and equitable.

Dated: February 10, 2026                    **POLSINELLI P.C.**

                                            By: */s/ Andrew J. Soven*_____
                                            Nipun J. Patel, Esq. (PA ID No. 208130)
                                            Andrew J. Soven, Esq. (PA ID No. 76766)
                                            Three Logan Square, Suite 1200
                                            Philadelphia, PA 19103
                                            Phone: (215) 267-3001
                                            Fax: (215) 267-3002
                                            npatel@polsinelli.com
                                            asoven@polsinelli.com

                                            *Attorneys for Plaintiffs*

## VERIFICATION

Lisa Berryhill hereby certifies that she is Vice President Dispute Resolution at Parallon Business Solutions acting on behalf of Plaintiffs, Galen Hospital Alaska, Inc. d/b/a Alaska Regional Hospital, HCA-HealthOne LLC d/b/a HCA HealthONE Presbyterian/St. Luke's Medical Center and d/b/a HCA HealthONE Rose Medical Center, and Savannah Health Services, LLC d/b/a Memorial Health University Medical Center, and is authorized to make this Verification on the Plaintiffs' behalf, and that the factual statements contained in the within Complaint are true and correct to the best of her knowledge, information and belief. The undersigned understands that false statements herein made are subject to the penalties of 18 P.A.C.S. § 4904 relating to unsworn falsification to authorities.

Lisa S. Berryhill

Dated: February 10, 2026

## CERTIFICATE OF COMPLIANCE

I, Andrew J. Soven, hereby certify that this filing complies with the provisions of *the Case Records Public Access Policy of the United Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

February 10, 2026.                              /s/ *Andrew J. Soven*___
                                               Andrew J. Soven, Esq. (PA ID No. 76766)

                                               *Attorney for Plaintiffs*

# Exhibit 1







# Welcome to My Highmark

Unlock your health plan benefits, then set and reach healthy goals.

**MEMBER LOGIN**    **REGISTER**



## Find top-quality care close by

Using your local Highmark provider network for your care and prescriptions helps you save time and money. Use your region's provider finder tools to find nearby:

- Doctors and specialists
- Prescription drug coverage and formularies
- Dental and vision care
- Hospitals and urgent care

**FIND DOCTORS AND RX**



## Register for My Highmark

Experience convenience when you manage your health on our app or website. Register now to get a personalized look at your health coverage – anytime, anywhere.

**REGISTER NOW**

## Download the My Highmark App

Once registered, My Highmark is the one-stop app for all of your plan benefits. Simply use your same login from the member website to easily manage your health care.

 



## You deserve good mental health

Mental health issues are different for everyone, which is why it's important to find the care option that's right for you. Whether you're considering medication, want to learn more about self-care, or just want to talk to someone, Highmark is here to help.

**VIEW MENTAL HEALTH SUPPORT**

## Learn about health plan benefits, find forms or pay your premium

Get access to the tools, resources and support you need to make the most of your health journey.

## Explanation of Benefits (EOB)

Once you use your health plan benefits, Highmark sends you an EOB. We explain what it is, what's covered and more.

**READ EOB FAQ**

## Forms Library

Find forms you need to take action on claims. Log in to review reimbursements, prescriptions and more. No library card needed.

**VIEW FORMS**

## Paying your premium

Save time by paying your premium on My Highmark. Log in to view invoices and to set up automatic payments with e-Bill.

**LOG IN**

# Social care is whole person care

Where you were born, grew up, live and work can impact up to 80% of your health. Take full advantage of your benefits.



## Get connected to support

Having a support system in place is important to your mental and physical well-being. Learn how to get help in finding reliable transportation, food assistance, safe housing and more.

**GET SUPPORT**



## Live better and make a difference

Highmark is working to help improve your well-being and the health of the communities it serves. Find support by taking a brief survey designed to help you live your best life and benefit the community you call home.

**TAKE THE SURVEY**



## Looking for more answers?

We want to help you find answers to commonly asked health plan and coverage questions. With Highmark Answers, you can explore topics related to:

- Why do I need to register for an account?
- How do I read my explanation of benefits (EOB)?
- Do I need a referral to see a specialist?
- How do I know if my prior authorization is approved?

**EXPLORE HIGHMARK ANSWERS**



## Find events near you

Discover healthy activities every season to help you keep moving, remain healthy and have fun.

**FIND EVENTS**



## Call Member Service

If you have questions, we have answers. Call the toll-free number on the back of your Highmark member ID card.

## Thinking about becoming a Highmark member?

Having a health plan means knowing what you want to achieve for your well-being. Find the right plan that suits your needs and budget.

**VIEW ALL PLANS**



Because Life.™

Linked in



Highmark is a registered mark of Highmark Inc. © 2026 Highmark Inc., All Rights Reserved.

All references to "Highmark" in this document are references to the Highmark company that is providing the member's health benefits or health benefit administration and/or to one or more of its affiliated Blue companies.

Highmark Blue Cross Blue Shield and Highmark Blue Shield are Medicare Advantage HMO, PPO, and/or Part D plans with a Medicare contract. Enrollment in these plans depends on contract renewal. Highmark Wholecare offers HMO plans with a Medicare Contract. Enrollment in these plans depends on contract renewal. Highmark Health Options Duals offers HMO plans with a Medicare Contract. Enrollment in these plans depends on contract renewal. ®Blue Cross, Blue Shield and the Cross and Shield symbols are registered service marks of the Blue Cross Blue Shield Association, an association of independent Blue Cross and Blue Shield plans.

The following entities, which serve the noted regions, are independent licensees of the Blue Cross Blue Shield Association: Western and Northeastern PA: Highmark Inc. d/b/a Highmark Blue Cross Blue Shield, Highmark Choice Company, Highmark Health Insurance Company, Highmark Coverage Advantage Inc., Highmark Benefits Group Inc., First Priority Health, First Priority Life Insurance Company, Highmark Care Benefits Inc., Highmark Senior Health Company, or Gateway Health Plan, Inc. d/b/a Highmark Wholecare. Central and Southeastern PA: Highmark Inc. d/b/a Highmark Blue Shield, Highmark Benefits Group Inc., Highmark Health Insurance Company, Highmark Choice Company, Highmark Senior Health Company, or Gateway Health Plan, Inc. d/b/a Highmark Wholecare. PA: **Your plan may not cover all your health care expenses. Read your plan materials carefully to determine which health care services are covered. For more information, call the number on the back of your member ID card or, if not a member, call 866-459-4418.** Delaware: Highmark BCBSD Inc. d/b/a Highmark Blue Cross Blue Shield or Highmark BCBSD Health Options Inc. d/b/a Highmark Health Options. Highmark Health Options Duals is offered by Highmark Blue Cross Blue Shield. West Virginia: Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield, Highmark Health Insurance Company, Highmark Senior Solutions Company, or Highmark Health Options West Virginia Inc. d/b/a Highmark Health Options and Highmark Blue Cross Blue Shield. Highmark Health Options Duals is offered by Highmark Blue Cross Blue Shield. **Visit https://www.highmarkbcbswv.com/networkaccessplan to view the Access Plan required by the Health Benefit Plan Network Access and Adequacy Act. You may also request a copy by contacting us at the number on the back of your ID card.** Western NY: Highmark Western and Northeastern New York Inc. d/b/a Highmark Blue Cross Blue Shield. Northeastern NY: Highmark Western and Northeastern New York Inc. d/b/a Highmark Blue Shield.

# Exhibit 2









# Exhibit 3

# Health Plan Quality Assurance

## Use this document along with your Summary of Benefits and Coverage and detailed benefit grid

### IN-NETWORK VERSUS OUT-OF-NETWORK CARE

All Highmark plan options let you choose your providers. When you need medical care, you can choose between **in-network** and **out-of-network** providers. It's important to understand the difference because your choice affects how much you pay for services. For example, some plans do not cover care from out-of-network providers, except for emergencies and a few other situations.

### In-network care

Doctors and hospitals that participate with us are called "in-network" providers. In-network providers include primary care doctors, specialists, hospitals, and a variety of treatment facilities. When you receive health care from an in-network provider, you typically pay less than you would at an out-of-network provider.



You can use this information to find your plan's in-network doctors and hospitals.

- **Call My Care Navigator at 1-888-BLUE-428.**
- Visit **highmarkbcbs.com** and click **Find a Doctor or Rx.**

### Out-of-network care

Doctors and hospitals that do not participate with us are called "out-of-network" providers. Please refer to your plan details to understand what coverage you may or may not have with out-of-network providers. Refer to your Summary of Benefits for a plan's specific coverage.

**Note for members seeking care in western Pennsylvania:** Highmark and UPMC have entered into Consent Decree agreements designed to protect your access to UPMC providers. For important details about how these agreements affect your plan benefits, please go to **Helpful Links** on **highmarkbcbs.com** or call 1-888-BLUE-428.

### MEDICAL NECESSITY, PRIOR AUTHORIZATIONS AND REVIEWS

### Medically necessary and appropriate

Our Medical Management and Policy (MM&P) team helps you get proper care. They work with your doctor, using specific guidelines to determine if care is medically necessary and appropriate.

Medically necessary and appropriate care helps ensure that you receive the right type of care, in the right place, and for the proper length of time. Medically necessary and appropriate care:

- Must be generally accepted as medical practice standards
- Must be clinically appropriate in type, frequency, extent, site, and duration
- Must be considered effective for your illness, injury, or disease
- Must not be for your or your provider's convenience
- Must not be more costly than another service that may give you similar results

No benefits will be provided unless it is determined that the service or supply is medically necessary and appropriate. If we denied coverage of a service or claim, you have the right to appeal the denial decision. More information about this process is included in the benefit booklet that you will receive after you enroll.

### Prior authorization, or preservice review

We must approve some services before you can get them. This is called prior authorization, or preservice review.

If you need a service that we must first approve, your in-network doctor will call us to get the authorization. An example of a service needing prior authorization is any kind of inpatient hospital care (except maternity care). If you don't get the prior authorization, you may have to pay up to the full amount of the charges.

The number to call for prior authorization is included on the ID card you will receive after you enroll. Please refer to the specific coverage information you will receive after you enroll.

### Prior authorization time frames and enrollee responsibilities

Our MM&P team helps you get care:

- In the right setting
- At the appropriate cost
- With the right outcomes



Your plan pays for covered services, supplies, and medications that are medically necessary and appropriate. These might be to prevent, evaluate, diagnose, or treat an illness, injury, or disease, or its symptoms. They:

- Must be generally accepted as standards of medical practice

- Must be clinically appropriate in type, frequency, extent, site and duration

- Must be considered effective for your illness, injury, or disease

- Must not be for your or your provider's convenience

- Must not be more costly than another service that may give you similar results

An in-network provider will contact MM&P to authorize your care. This includes inpatient and outpatient non-emergency care. It is their right to decide if a service, supply, or medication is medically necessary and appropriate. They do this before your plan pays benefits. Your plan will not pay benefits if our team of doctors and nurses decides that the covered service, supply, or medication is not medically necessary and appropriate.

A decision on a request for prior authorization for medical services will typically be made within 72 hours of us receiving the request for urgent cases or 15 days for non-urgent cases.

 **No Referrals Needed** — All Highmark plans let you see a specialist without needing a referral from your primary care doctor.

**What We Cover** — Please refer to the Summary of Benefits and Coverage and detailed benefit grid.

### Out-of-network services

It's different if you are admitted to an out-of-network facility. In this case, you must call MM&P to find out if the covered services are medically necessary and appropriate. This does not apply to emergencies.

Call MM&P for precertification at the Member Service number on the back of your ID card before you are admitted to an out-of-network facility, so that you understand your financial responsibility. You should:

- Call seven to 14 days before your planned admission

- Call within 48 hours after an emergency or maternity-related admission

- Call as soon as you can as the last option

### What happens if you don't call?

If you do not call to authorize an out-of-network admission, MM&P will review your care after you receive services. MM&P will decide if the covered service you received was medically necessary and appropriate. If MM&P decides that it was not, you will be responsible for all hospital charges.

Out-of-network providers do not have to contact MM&P. If they do, they do not have to accept MM&P's decision. As a result, you may receive services that are not considered medically necessary and appropriate under your plan. You could be responsible for their costs.

### Postservice review

If we denied payment for a service that you already had, your doctor may ask for a "retrospective review." For this review, we will take a detailed look at your records and information to determine if the services were medically necessary and appropriate.

### Concurrent review

If you are admitted to the hospital and your doctor feels that you may need more days of care, a "concurrent review" may happen. A concurrent review is a detailed review while you are still in the hospital. We do this to determine if the additional in-hospital services are medically necessary and appropriate. Decisions on a request for concurrent review are typically made within 24 hours of receipt.

## CASE MANAGEMENT

If you are injured, seriously ill, or considering certain types of surgery, we may begin a collaborative process that involves case managers, you, your family or significant other, physicians, and institutional providers. Case Management assesses, plans, coordinates, monitors, and evaluates all of the options and services required to meet your health needs with the goal of educating you to self-manage your care.

## NON-COVERED SERVICES

Covered and non-covered services may vary by plan. Please keep in mind that you could be responsible for the total amount of any services not covered by your plan. For more information about services your plan covers, please refer to the benefit materials available to you after you enroll in your Highmark health plan or to the Summary of Benefits and Coverage.



## Non-covered services include, but are not limited to:

- Personal hygiene and convenience items

- Services rendered prior to the member's effective date or after the termination date of coverage

- Custodial care, domiciliary care, and protective and supportive care, including educational service, rest cures, and convalescent care

- Services that are experimental/investigative in nature

- Services that are not medically necessary or appropriate

- Immunizations required for foreign travel or employment except as otherwise set forth in the Preventive Schedule

- Treatment of sexual dysfunction that is not related to organic disease or injury

- Services for or related to surrogate pregnancy

- Routine or periodic physical examinations, except as set forth in the Preventive Schedule, the completion of forms, and the preparations of specialized reports solely for insurance, licensing, employment, or other non-preventive purposes, except as required by law

- Methadone hydrochloride treatment (methadone maintenance) for which no additional functional progress is expected to occur

## PRESCRIPTION DRUG COVERAGE

### Formulary

Your plan uses a formulary, or list of drugs it covers. The formulary includes products in every major treatment category, as well as certain over-the-counter medications. A committee of our pharmacists and physicians developed the formulary. This committee reviews and updates the formulary regularly.



To find out if a drug is on the formulary, please visit your plan's website at: **highmarkbcbs.com**

Select the **Find a Doctor or Rx** tab. Next, choose the **Find a Drug** link. Then select your plan's formulary. Enter the name of the drug to begin your search. In-network providers can also view the formulary. Please refer to the website or talk with your health care provider for the most up-to-date information.

Your prescription drug program includes coverage for both formulary and non-formulary drugs at the specific copayment or coinsurance amounts listed in the Summary of Benefits and Coverage.

### Participating retail pharmacies

Your plan covers prescriptions when you purchase them through an in-network pharmacy. To find a participating pharmacy, go to your member website listed above. Select the **Find a Doctor or Rx** tab. Then choose on **Find a Pharmacy**. Select the applicable pharmacy network as outlined in the Summary of Benefits and Coverage. Enter the location information and choose the **Locate Pharmacy** button.

### Mail order prescriptions

For long-term or maintenance medications, you can take advantage of our mail order pharmacy, Express Scripts®. You can get up to a 90-day supply of each covered medication for just one mail order copayment. To learn more or to get started, log in to your member website listed above. Select the **Prescriptions** tab and see the **Save with mail order** section. Find out how you can transfer a prescription or start a new one.

### Generic drugs

Generic drugs have the same chemical composition and therapeutic effect as brand-name drugs and must meet the same Food and Drug Administration (FDA) requirements. Under your prescription coverage, you will pay the lowest copayment or coinsurance amounts when you purchase generic drugs. You will pay a higher copayment for brand-name drugs. Depending on your coverage, if your provider authorizes a generic drug but you purchase a brand-name drug, you will be responsible for paying the cost difference between the brand-name drug and generic drug, as well as the brand-name drug copayment or coinsurance amounts.

### Some drugs need to be approved (pre-authorized)

Certain drugs on the formulary have limits based on medical necessity. Some drugs need your plan's approval to be covered. Your doctor must contact us if a drug needs prior approval. We will tell you and your doctor in writing if we do not approve a drug request. We will also tell you how to file an appeal, if needed. For drugs that are covered by your plan (formulary drugs), a prior authorization decision will typically be made within 72 hours of us receiving the request for urgent cases and 15 days for non-urgent cases.

### Quantity limits

To help ensure the safe and effective use of prescription drugs, your plan includes quantity limits for some drugs. That means the pharmacist will fill a prescription only up to the highest recommended guideline amount. This applies even if a doctor writes it for more. Your doctor will need to call us to discuss approval of a higher quantity.



## Drugs not on the formulary — drug exception time frames and responsibilities

If you have a closed formulary, we must approve payment for drugs that are not on the formulary. If your doctor thinks you need to take a drug that is not on the formulary, your doctor will send us a request for approval. You or someone you designate can also request a non-formulary drug exception.

Exception requests can be mailed to the following address:

Clinical Pharmacy Services
P.O. Box 279
Pittsburgh, PA 15230

Exception requests may also be faxed to 1-866-240-8123 or emailed to RxMbrRequests@highmark.com.

If your request is for a non-formulary drug for a condition that does not seriously jeopardize your life or health (a standard request), we will make a decision and notify you within 72 hours of receiving the request. If the request is for a non-formulary drug for a condition that may seriously jeopardize your life or health (an expedited request) or a drug you are already taking, we will make a decision and notify you within 24 hours of receiving the request.

If you are not happy with our decision on your request for a non-formulary drug, you can contact Member Service at the phone number on your member ID card and ask for an external review. We will then send your request to another organization that will review your request and notify you of a decision within 72 hours for a standard request and 24 hours for an expedited request.

## CLAIMS AND PAYMENTS

### Claims payment policies and practices

- When you need medical care, you can choose between in-network and out-of-network providers. It's important to understand the difference because your choice affects how much you pay for services. For example, care from an out-of-network provider might not be covered except for emergencies or when the services are not available from an in-network provider.

- Doctors and hospitals that participate with us are called "in-network" providers. In-network providers include primary care doctors, specialists, hospitals and a variety of treatment facilities. When you receive health care from an in-network provider, you typically pay less than you would at an out-of-network provider. If you have an HMO or EPO plan, you are not covered for out-of-network services (except for emergency services).

- Doctors and hospitals that do not participate with us are called "out-of-network" providers. You will pay the most if you use an out-of-network provider, and you might receive a bill from a provider for the difference between the provider's charge and what your plan pays (balance billing). Be aware that your in-network provider might use an out-of-network provider for some services (such as lab work). Check with your provider before you get care.

### How to submit a claim

A claim is a request you make for payment of the charges or costs for a covered service you received. If you receive services from an in-network provider, you do not have to file a claim. Your in-network provider takes care of that for you. If you go to an out-of-network provider, you may have to file the claim yourself. If you have to file the claim yourself, simply follow these easy steps:

1. Know your benefits. Review your Agreement to see if the services you received are eligible under your plan.

2. Get a detailed bill that includes:

   - The name and address of the service provider

   - The patient's full name

   - Date of service

   - Description of the service/supply

   - Amount charged

   - Diagnosis or nature of illness

   - Doctor's certification for durable medical equipment

   - Nurse's license number and shift worked for private duty nursing

   - Total mileage for ambulance services

   Canceled checks, cash register receipts, or personal lists are not acceptable as bills.

3. Copy bills for your records. You must submit original bills. Once your claim is received, we cannot return bills.

4. Complete a claim form. Make sure all information is completed properly. Date the form. Claim forms may be obtained at www.highmarkbcbs.com/login/#/forms. You can also obtain a claim form by calling the Member Service number on the back of your member ID card. For questions, please call 1-800-294-9568.

   You can submit your claim to:

   Claims (plan code 363)
   P.O. Box 890062
   Camp Hill, PA 17089-0062

   Claims (plan code 378)
   P.O. Box 890173
   Camp Hill, PA 17089-01735

5. After you complete steps 1 through 4, attach all detailed bills



to the claim form. Mail the form to the address on the form.

You can file multiple services for the same family member with one claim form. However, you must complete a separate claim form for each covered member. You must submit your claim no later than 15 months after the date you received services.

## Grace periods and claims submissions

You are required to pay your premium by the scheduled due date. If you do not do so, your coverage could be canceled. For most individual health care plans, if you do not pay your premium on time, you will receive a 30-day grace period. A grace period is a time period when your plan will not terminate even though you did not pay your premium. Any claims submitted for you during that grace period will be pended. When a claim is pended, that means no payment will be made to the provider until your delinquent premium is paid in full. If you do not pay your delinquent premium by the end of the 30-day grace period, your coverage will be terminated. If you pay your full outstanding premium before the end of the grace period, we will pay all claims for covered services you received during the grace period that are properly submitted. If you have an individual HMO plan in Pennsylvania, we will pay your claims during the 30-day grace period; however, your benefits will terminate if your delinquent premium is not paid by the end of that grace period.

If you are enrolled in an individual health care plan offered on the Health Insurance Marketplace and you receive an advance premium tax credit, you will get a three-month grace period, and we will pay all claims for covered services that are properly submitted during the first month of the grace period. During the second and third months of that grace period, we will not pay any claims you incur. If you pay your full outstanding premium before the end of the three-month grace period, we will pay all claims for covered services that are properly submitted for the second and third months of the grace period. If you do not pay all of your outstanding premium by the end of the three-month grace period, your coverage will terminate, and we will not pay for any claims submitted for you during the second and third months of the grace period. Your provider may balance bill you for those services.

## Retroactive denials

A retroactive denial is the reversal of a claim we have already paid. If we retroactively deny a claim we have already paid for you, you will become responsible for payment. Some reasons why you might have a retroactive denial include a claim that was paid during the second or third month of a grace period or a claim paid for a service for which you were not eligible. You can avoid retroactive denials by paying your premiums on time and in full, and making sure you talk to your provider about whether the service being performed is a covered benefit. You can also avoid retroactive denials by obtaining your medical services from an in-network provider.

## Explanation of benefits

Once your claim is processed, you may receive an Explanation of Benefits (EOB) from us. The EOB is not a bill. It's a statement that gives you information about services you received. Services can be from physicians, facilities, or other professional providers. It also includes costs you may owe for these services.

The EOB includes:

- The provider's charge
- The allowable amount
- The copayment, deductible, and coinsurance amounts, if applicable, that you're required to pay
- The total benefits payable
- The total amount you owe

To get your EOBs online, register on **highmarkbcbs.com**. Your EOB can also be mailed to you. If you do not owe a payment to the provider, you may not receive an EOB.

If you are enrolled in a qualified high deductible health plan with a Health Savings Account, you will receive a Plan Activity Statement instead of an EOB. If this applies to you, please refer to the Health Savings Account section in your Benefit Booklet for information about your Plan Activity Statement. For information on how to read and understand your EOB, please refer to How to Read Your Explanation of Benefits (EOB) Statement at the end of this document.

## Coordination of benefits

If you have more than one health insurance plan, those plans need to work together to make sure you are getting the most out of your coverage. One plan is your primary plan. This plan pays your claims first. The other plan is your secondary plan and pays some of any costs remaining after your primary plan pays. If you have other health insurance coverage, you need to tell us so we can coordinate the benefits we provide with the other health insurance plan to establish payment of services. If you have any questions, you can call the Member Service number on the back of your Member ID card or 1-800-294-9568 or TTY 711.

## Overpayment of premium

If you believe you have paid too much for your premium and should receive a refund, please call the Member Service number on the back of your ID card.



## HOW WE PROTECT YOUR RIGHT TO PRIVACY

At Highmark, we have established policies and procedures to protect the privacy of our members' protected health information (PHI) from unauthorized or improper use. We restrict access to our members' non-public personal information to only individuals who need to know that information to provide you health products or services. We maintain physical, electronic, and procedural safeguards that comply with state and federal regulations to safeguard against unauthorized access, use and disclosures. PHI may be oral, written, or electronic.

For example, as permitted by law, we may use or disclose PHI for treatment, payment, and health care operations. This could include claims management, routine audits, coordination of care, quality assessment and measurement, case management, utilization review, performance measurement, customer service, credentialing, medical review, and underwriting. With the use of measurement data, we are able to help manage our members' health care needs. We can identify certain individuals who could benefit from health, wellness, and condition management programs.

If we ever use your PHI for non-routine uses, we will ask you to give us your permission by signing a special authorization form, except with regard to court orders and subpoenas. You have the right to access the information your doctor has been keeping in your medical records, and any such request should be directed first to your network physician.

You benefit from the many safeguards we have in place to protect the use of data we maintain. This includes not discussing PHI outside of our offices, confirming who you are before we discuss PHI on the phone, requiring our employees to sign statements in which they agree to protect your confidentiality, using computer passwords to limit access to your PHI, and including confidentiality language in our contracts with doctors, hospitals, vendors, and other health care providers. For more information about our privacy practices, please review our Notice of Privacy Practices at highmark.com/hmk2/privacy.shtml.

We provide aggregate information to employer groups whenever possible. In those instances when PHI is required, the employer group will be required to sign an agreement before the information is released.



# HOW TO READ YOUR
# EXPLANATION OF
# BENEFITS (EOB) STATEMENT
## FOR PLANS WITH A DEDUCTIBLE THAT IS INCLUDED IN THE OUT-OF-POCKET LIMIT

Deductible → Out of Pocket Limit

An EOB is not a bill. Instead, it explains how your benefits have been applied. It shows what you may owe after your health insurance claim has been processed. You should review it to make sure you received the services that are being billed.

**HIGHMARK**
An Independent Licensee of the Blue Cross and Blue Shield Association

**Explanation of Benefits**
**THIS IS NOT A BILL**

1 Contract Holder Name: SAMUEL SAMPLE
2 Member ID: 012345678910
Group Name: ABC CORP.
Group ID: 123456 789
3 Claim Activity For: SAMUEL SAMPLE
4 Claim Number: 12345678910

| EXPLANATION AT A GLANCE | | |
|---|---|---|
| 5 Date of Service: 01/28/14 | | |
| 6 We Sent Payment To:<br>PATHOLOGY PRACTICE<br>A Network Provider | | |
| Claim Payment Amount: | $ | 90.00 |
| 7 Provider May Bill You<br>(If Not Already Paid) : | $ | 7.00 |

| Member Responsibility | | | | | |
|---|---|---|---|---|---|
| Provider<br>Date of Service<br>Type of Service<br>Service Code<br>(Number of Services) | Provider's<br>Charge | Non-Billable<br>To Member | Plan Allowance<br>(Covered Charges) | Your<br>Deductible | Amount You<br>Owe Provider<br>(total of<br>shaded columns) |
| 8 PATHOLOGY PRACTICE<br>01/28/14<br>SURGICAL PATHOLOGY TEST<br>88305                    (2) | 284.00 | 187.00<br>J4047 | 97.00 | 7.00 | 7.00 |
| TOTALS | 9 284.00 | 10 187.00 | 11 97.00 | 12 7.00 | 13 7.00 |

14
| Explanation of Remark Codes |
|---|
| J4047    - This is the difference between the provider's charge and our allowance. Since the provider is in-network, you are not responsible for this amount. |
| X5018    - The allowance for this service has been applied to the dollar deductible amount required under the patient's coverage. |

15
| PATIENT BENEFIT SUMMARY |
|---|
| Patient: SAMUEL SAMPLE Group Number: 123456-789<br>Benefit Period: 01/01/14 - 12/31/14<br>$2,350.00 has been applied to your $6,350.00 individual in network total maximum out-of-pocket amount.<br>$2,350.00 has been applied to your $3,000.00 individual in network out-of-pocket limit.<br>You have satisfied $1,000.00 of your $1,000.00 individual in network deductible.<br><br>Please refer to your benefit booklet or agreement for further information. Amount(s) shown may include totals from claims which are still being processed and for which you have not been notified. |

16
| PROGRAM BENEFIT SUMMARY |
|---|
| Benefit Period: 01/01/14 - 12/31/14 Group Number: 123456-789<br>$2,350.00 has been applied to your $12,700.00 program in network total maximum out-of-pocket amount.<br>$2,350.00 has been applied to your $4,000.00 program in network out-of-pocket limit.<br>You have satisfied $1,000.00 of your $2,000.00 program in network deductible.<br><br>Please refer to your benefit booklet or agreement for further information. Amount(s) shown may include totals from claims which are still being processed and for which you have not been notified. |

Please turn this page over for definitions of health insurance terms.

To better understand your EOB and how charges are calculated, here are definitions for terminology used in the statement.

**1** CONTRACT HOLDER NAME – the health care coverage is listed under this person's name.

**2** MEMBER ID – contract holder's member identification number.

**3** CLAIM ACTIVITY FOR – the person who received the services, either the contract holder, a spouse, or dependent.

**4** CLAIM NUMBER – the system assigns each claim a number for identification purposes.

**5** DATES OF SERVICE – the day or days when services were performed.

**6** WE SENT PAYMENT TO – health care provider that received payment for services.

**7** PROVIDER MAY BILL YOU – what you may owe the provider.

**8** PROVIDER – facility or professional providing medical service, such as a hospital or a doctor.

   A. DATE OF SERVICE – the day or days when services were performed.

   B. TYPE OF SERVICE – surgery, office visit or test, for example.

   C. SERVICE CODE – medical billing code to identify what services were performed.

   D. NUMBER OF SERVICES – total number of services performed.

**9** PROVIDER CHARGES – the amount the provider charged for the services.

**10** NON-BILLABLE TO MEMBER – amount that the provider discounts for being in-network and does not charge you.

**11** PLAN ALLOWANCE (COVERED CHARGES) – the amount your plan allows as payment. This is the discounted rate you receive.

**12** DEDUCTIBLE – the amount that has been applied toward meeting your deductible.

**13** AMOUNT YOU OWE PROVIDER (TOTAL OF SHADED COLUMNS) – the total amount you owe, including any deductible, coinsurance, or copayment amounts.

**14** EXPLANATION OF REMARK CODES – these codes explain why payments are approved or denied.

**15** PATIENT BENEFIT SUMMARY – summarizes a single patient's coverage within a benefit period.

   A. INDIVIDUAL IN-NETWORK TOTAL MAXIMUM OUT-OF-POCKET AMOUNT the most you pay during a benefit period *including* deductibles, copayments, and coinsurance. Once this amount is reached, the health plan pays 100% of the allowed amount for covered services.

   B. INDIVIDUAL IN-NETWORK OUT-OF-POCKET LIMIT – the most you pay during a benefit period, *excluding* copayments. This amount generally includes only coinsurance. Once this amount is reached, the health plan pays 100% of the allowed amount for covered services. You may still be responsible for copayments or to fulfill the deductible.

   C. INDIVIDUAL IN-NETWORK DEDUCTIBLE – the amount you pay during a benefit period before your health plan begins to pay anything.

**16** PROGRAM BENEFIT SUMMARY – similar to the Patient Benefit Summary (#15), these amounts are added together to summarize all family members' coverage within a benefit period.

   A. INDIVIDUAL IN-NETWORK TOTAL MAXIMUM OUT-OF-POCKET AMOUNT the most you pay during a benefit period *including* deductibles, copayments, and coinsurance. Once this amount is reached, the health plan pays 100% of the allowed amount for covered services.

   B. INDIVIDUAL IN-NETWORK OUT-OF-POCKET LIMIT – the most you pay during a benefit period, *excluding* copayments. This amount generally includes only coinsurance. Once this amount is reached, the health plan pays 100% of the allowed amount for covered services. You may still be responsible for copayments or to fulfill the deductible.

   C. INDIVIDUAL IN-NETWORK DEDUCTIBLE – the amount you pay during a benefit period before your health plan begins to pay anything.

If you suspect fraud or abuse involving your health insurance, please call the toll-free fraud or abuse hotline at 1-800-438-2478.



This page was left blank intentionally

This page was left blank intentionally

This page was left blank intentionally

Insurance or benefit administration may be provided by Highmark Blue Cross Blue Shield, Highmark Choice Company, Highmark Coverage Advantage, Highmark Health Insurance Company, First Priority Health or First Priority Life Insurance Company, all of which are independent licensees of the Blue Cross and Shield Association. Health care plans are subject to terms of the benefit agreement.

To find more information about Highmark's benefits and operating procedures, such as accessing the drug formulary or using network providers, please review Health Plan Quality Assurance by visiting discoverhighmark.com/region-selector or for a paper copy, call 1-855-873-4106.

**Discrimination is Against the Law**

The Claims Administrator/Insurer complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex, including sex stereotypes and gender identity. The Claims Administrator/Insurer does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex assigned at birth, gender identity or recorded gender. Furthermore, the Claims Administrator/Insurer will not deny or limit coverage to any health service based on the fact that an individual's sex assigned at birth, gender identity, or recorded gender is different from the one to which such health service is ordinarily available. The Claims Administrator/Insurer will not deny or limit coverage for a specific health service related to gender transition if such denial or limitation results in discriminating against a transgender individual. The Claims Administrator/Insurer:

- Provides free aids and services to people with disabilities to communicate effectively with us, such as:
  - Qualified sign language interpreters
  - Written information in other formats (large print, audio, accessible electronic formats, other formats)
- Provides free language services to people whose primary language is not English, such as:
  - Qualified interpreters
  - Information written in other languages

If you need these services, contact the Civil Rights Coordinator.

If you believe that the Claims Administrator/Insurer has failed to provide these services or discriminated in another way on the basis of race, color, national origin, age, disability, or sex, including sex stereotypes and gender identity, you can file a grievance with: Civil Rights Coordinator, P.O. Box 22492, Pittsburgh, PA 15222, Phone: 1-866-286-8295, TTY: 711, Fax: 412-544-2475, email: CivilRightsCoordinator@highmarkhealth.org. You can file a grievance in person or by mail, fax, or email. If you need help filing a grievance, the Civil Rights Coordinator is available to help you. You can also file a civil rights complaint with the U.S. Department of Health and Human Services, Office for Civil Rights electronically through the Office for Civil Rights Complaint Portal, available at https://ocrportal.hhs.gov/ocr/portal/lobby.jsf, or by mail or phone at:

U.S. Department of Health and Human Services
200 Independence Avenue, SW
Room 509F, HHH Building
Washington, D.C. 20201
1-800-368-1019, 800-537-7697 (TDD)

Complaint forms are available at http://www.hhs.gov/ocr/office/file/index.html.

If you speak English, language assistance services, free of charge, are available to you. Call 1-800-876-7639.

Si usted habla español, servicios de asistencia lingüística, de forma gratuita, están disponibles para usted. Llame al 1-800-876-7639.

如果您说中文，可向您提供免费语言协助服务。
请致电 1-800-876-7639.

Nếu quý vị nói tiếng Việt, chúng tôi cung cấp dịch vụ hỗ trợ ngôn ngữ miễn phí cho quý vị. Xin gọi số 1-800-876-7639.

한국어를 사용하시는 분들을 위해 무료 통역이 제공됩니다.
1-800-876-7639 로 전화.

Kung nagsasalita ka ng Tagalog, may makukuha kang mga libreng serbisyong tulong sa wika. Tumawag sa 1-800-876-7639.

Если вы говорите по-русски, вы можете воспользоваться бесплатными услугами языковой поддержки. Звоните 1-800-876-7639.

إذا كنت تتحدث اللغة العربية، فهناك خدمات المعاونة في اللغة المجانية متاحة لك. اتصل على الرقم 1-800-876-7639 .

Si se Kreyòl Ayisyen ou pale, gen sèvis entèprèt, gratis-ticheri, ki la pou ede w. Rele nan 1-800-876-7639.

Si vous parlez français, les services d'assistance linguistique, gratuitement, sont à votre disposition. Appelez au 1-800-876-7639.

Dla osób mówiących po polsku dostępna jest bezpłatna pomoc językowa. Zadzwoń 1-800-876-7639.

Se a sua língua é o português, temos atendimento gratuito para você no seu idioma. Ligue para 1-800-876-7639.

Se parla italiano, per lei sono disponibili servizi di assistenza linguistica a titolo gratuito. Chiamare l'1-800-876-7639.

Wenn Sie Deutsch sprechen, steht Ihnen unsere fremdsprachliche Unterstützung kostenlos zur Verfügung. Rufen Sie 1-800-876-7639.

日本語が母国語の方は言語アシスタンス・サービスを無料でご利用いただけます。1-800-876-7639 を呼び出します。

اگر شما به زبان فارسی صحبت می کنید، خدمات کمک زبان رایگان با تماس با شماره 7639-876-800-1 .

9/20  MX179701



# Exhibit 4

# BlueCard® Program

## Answers to Frequently Asked Questions

### What is the BlueCard Program?

BlueCard is a national program that enables members of one Blue Plan to obtain healthcare service benefits while traveling or living in another Blue Plan's service area. The program links participating healthcare providers with the independent Blue Cross and Blue Shield Plans across the country, and in more than 200 countries and territories worldwide, through a single electronic network for claims processing and reimbursement. You may submit claims for patients from other Blue Plans, domestic and international, to your local Blue Cross and/or Blue Shield Plan. The local Blue Cross and/or Blue Shield Plan is your sole contact for education, contracting, claims payment/adjustments and problem resolution.

**Questions by Topic** (click on the topic)

**Roles and Responsibilities**

**Eligibility and Benefits**

**Claims Submission**

**Coordination of Benefits (COB)**

**Prior Authorization and/or Pre-Certification**

**Medical Records**

**Medical, Benefit, Payment Policy**

**Claims Payment**

**Medicare Crossover**

**Medicare Advantage**

**Contiguous Counties/Overlapping Service Areas**

### Roles and Responsibilities                    Return to Top

#### What are the roles and responsibilities of the local Blue Cross and/or Blue Shield Plans to their providers?

Your local Blue Cross and/or Blue Shield Plan's responsibilities include all provider related functions, such as:

- Being the single contact for all claims payment, customer service issues, provider education, adjustments and appeals.

- Pricing claims and applying pricing and reimbursement rules consistent with provider contractual agreements.

- Forwarding all clean claims received to the member's Blue Cross and Blue Shield Plan to adjudicate based on eligibility and contractual benefits.

- Conducting appropriate provider reviews and/or audits.

- Confirming that providers are performing services and filing claims appropriately within their scope of practice and according to their local Blue Cross and/or Blue Shield Plan.

- Conducting HIPAA standard transactions.

- Training for providers on BlueCard (Plan optional)

## What are the roles and responsibilities of the Member home plan to the provider?

- Adjudicate claims based on member eligibility and contractual benefits.

- Respond to prior authorization and pre-certification requests/inquiries.

- Request medical records through the local Plan when review for medical necessity, determination of a pre-existing condition, or high cost/utilization is required.

## What are the roles and responsibilities for the Provider?

- Obtaining benefits and eligibility information, including covered services, copayments and deductible requirements.

- Filing claims with the correct local Plan and including, at minimum, the required elements to ensure timely and correct processing, such as:

  - Current member ID card number.
  - All Other Party Liability information.
  - All member payments such co-pay, co-insurance or deductibles

- Submitting medical records in a timely manner when requested by the local or member home Plan

## Eligibility and Benefits                                        Return to Top

## How can Providers obtain member eligibility information?

Member eligibility information should be obtained by submitting a Blue Exchange Eligibility & Benefits Inquiry (HIPAA transaction 270) request through your local Blue Plan, but can also be obtained by calling 1-800-676-BLUE(2583). If prior authorization or pre-certification information is required in addition to eligibility, Providers should call 1-800-676-BLUE(2583).

- It is more beneficial when submitting a HIPAA transaction 270 request to use the appropriate Service Type codes for the specific service being provided. Use of the general Service Type "30" (Health Benefit Plan Coverage) or Service Type "1" (Medical Care) may not provide enough information to address all related Inpatient, Outpatient, Emergency and Professional benefits and does not include information on Benefit Limitations and Place of Service requirements.

Verify the member's cost sharing amount before processing payment. Co-pay, co-insurance, deductibles and accumulated benefits can be obtained from the electronic Blue Exchange Eligibility & Benefits Response (HIPAA transaction 271) to the HIPAA transaction 270. Please do not process full payment upfront.

## What specific information should the Provider Obtain?

It is recommended that Providers request the most current ID card at every visit since new ID cards maybe be issued to members throughout the year. Member ID cards may include one of several logos identifying the type of coverage the member has and/or indicating the provider's reimbursement level.

- Blank (empty) suitcase

- o  Traditional, HMO (Health Maintenance Organization), POS (Point of Service) and Limited Benefit Product type benefits

- PPO in suitcase

  - o  PPO or EPO type benefits

- No suitcase

  - o  Medicaid, State Children's Health Insurance Programs (SCHIP) administered as a part of a state's Medicaid program, Medicare Complementary and Supplemental products, also known as Medigap type benefits.

The provider should request specific information including eligibility, benefits, cost sharing, prior authorization/pre-certification requirements, care/utilization management requirements, and concurrent review requirements when contacting the member home Plan for benefit and eligibility information.

## Claim Submission                                                    *Return to Top*

### How should providers bill claims for out-of-area members?

Providers should bill claims for out-of-area members the same way they bill claims for their local Blue Cross and/or Blue Shield Plan members.  When submitting the claim:

- The member ID numbers should be reported exactly as shown on the ID card. Do not add, omit or alter any characters from the member ID number.

- Indicate on the claim any payment you collected from the patient.

- Only submit medical records if requested.

### What should you do if you haven't received a response to your initial claim submission?

If you have a question regarding the status of an outstanding claim, you can submit an electronic Blue Exchange Claim Status Request (HIPAA transaction 276) or contact your local Plan.

Do not send in a duplicate claim. Sending another claim or having your billing agency resubmit claims automatically slows down the claims payment process and creates confusion for the member.

## Coordination of Benefits                                            *Return to Top*

### How should Coordination of Benefits (COB) be handled when a member has Blue on Blue coverage? Another carrier?

In cases where Blue on Blue coverage has been identified, and the member has dual coverage with the same and/or differing Blue Plans you should consider the following:

- When submitting the claim, it is essential that you enter the correct Blue Plan name as the secondary carrier. This may be different from the local Blue Plan. Check the member's ID card for additional verification or ask them to complete the Universal Blue COB Questionnaire available on your local Plan's website.

- On the electronic HIPAA transaction 837 or paper claim, it is important in box 11D "YES" or "NO" be checked for Professional claims or form fields 50, 58-62 be completed for Institutional claims

to ensure the claim will be reviewed properly by the local Blue Plan. For Professional claims if the member does not have other insurance, it is imperative that you indicate this. Leaving the box unmarked can cause the Member's Home Plan to stop the claim to investigate for COB.  By completing the information, you are helping ensure your claim will be processed more timely.

- Review the EOP/EOB from the primary Blue Plan prior to submitting a claim to the secondary Blue Plan to avoid duplicate claims submission. The primary Blue Plan may have forwarded the claim to the secondary Blue Plan through BlueCard. If the secondary claim was not handled by the local Blue Plan then forward a copy of the claim to your local Blue Plan with any Other Party Liability (OPL) information included.

- Carefully review the payment information from all payers involved on the remittance advice before balance billing the patient for any potential liability.

In cases where there is more than one payer and another Blue Plan or commercial insurance carrier is the primary payer, submit the other carrier's name and address or Explanation of Benefits with the claim to your local Plan. You may also go to your local Plan's website and download a copy of the Universal Blue COB Questionnaire that the member can complete and sign at the time of service and send it to your local Plan with the claim. Please ensure that the form is completely filled out and at a minimum, include your name and tax identification or NPI number, the policy holder's name, group number and identification number including the three character alpha-prefix and the member's signature. Not including the COB information with the claim may delay payment if the members home Plan investigates the claim needlessly.

If another non-Blue health plan is primary and any other Blue Plan is secondary, submit the claim to the local Plan only after receiving payment from the primary payer. Include the explanation of payment from the primary carrier with your claim submittal.

## Prior Authorization/Pre-Certification                                   [Return to Top](#)

### Are providers required to cooperate with the member's Blue Plan prior authorization/ pre-certification programs?

While out-of-area BlueCard members are currently responsible for obtaining prior authorization or pre-certification from their BCBS Plans, most providers choose to handle this obligation on the member's behalf. Members may be held financially responsible if necessary approvals are not obtained and the claim is denied.  The provider may have to manage debt collection in this situation.

When verifying member eligibility and benefits, providers should request information on prior authorization and pre-certification, care management/utilization management and concurrent review, as required for inpatient or outpatient services.

### How can Providers obtain prior authorization/pre-certification information for out-of-area members?

Member prior authorization or pre-certification information can be obtained both electronically and telephonically.

- General information on prior authorization and pre-certification information can be found on the local Blue Plan webpage under Out-of-Area Member Medical Policy and Pre-Authorization/Pre-Certification Router utilizing the three letter prefix found on the member ID card.

- Providers can also contact 1-800-676-BLUE(2583) to obtain prior authorization or pre-certification information. When prior authorization or pre-certification for a specific member is handled separately from eligibility verifications at the member's Blue Plan, your call will be routed directly

to the area that handles prior authorization or pre-certification.  You will choose from four options depending on  the type of service for which you are calling:

- o  Medical/Surgical
- o  Behavioral Health
- o  Diagnostic Imaging/Radiology
- o  Durable/Home Medical Equipment (D/HME)

If you are inquiring about both, eligibility and prior authorization or pre-certification, through 1-800-676-BLUE(2583), your eligibility inquiry will be addressed first.  Then you will be transferred, as appropriate, to the prior authorization or pre-certification area.

Please note that if a prior authorization and pre-certification determination is not provided at the time of the call, the determination may be communicated to a different area (i.e. facility's Utilization Management area) than the area that initiated the pre-certification request. Providers are encouraged to ask the member's Blue Plan about this situation when they call in order to prevent duplicate requests.

- With the submission of an Eligibility HIPAA transaction 270 request through your local Blue Plan, the Eligibility HIPAA transaction 271 response may indicate that a prior authorization or pre-certification is required for an eligible service.

Return to Top

## Are providers required to hold the patient harmless for penalties assessed for not following the member's Blue Plan authorization protocols?

The out-of-area BlueCard member is responsible for obtaining pre-certification or prior authorization from his/her Blue Cross and/or Blue Shield Plan. As a result, the member is responsible for any penalty assessed for non-compliance.

## Medical Records
Return to Top

## Should a provider include medical records with the original claim?

Providers are not encouraged to submit unsolicited medical records or other clinical information unless requested. If medical records or other relevant information is needed to finalize the claim payment, the local Blue Cross and/or Blue Shield Plan will notify you.

- If you receive requests for medical records from other Blue Plans *prior to rendering services*, as part of the prior authorization process, please submit them directly to the member's Plan that requested them.

- Follow the submission instructions given on the request, using the specified physical or email address or fax number. The address or fax number for medical records may be different than the address you use to submit claims.

- There is a difference between reviewing a claim for medical necessity after the service has already been rendered and reviewing a prior authorization for medical appropriateness; these reviews are not the same:

  - o  Medical Necessity - validates the service is medically necessary according to their members Blue Plan medical policy.

     o   Medically Appropriate - validates that service rendered matches the prior authorization and the dollar amounts are in-line.

- When a claim has been denied for medical records and the records have been submitted to your local Plan, it is recommended that providers wait at a minimum 20 business days before submitting a follow up request for status of claim adjudication.

- If you are the rendering or performing provider for a service, include the name and address of the referring or ordering provider on your original claim submission. Including this information will help ensure that if medical records are needed that they will be requested from the correct provider.

## Medical, Benefit, Payment Policy                                      Return to Top

### Which Plan's Medical Policy applies for out-of-area members?

Only a member's Blue Plan Medical Policy applies to BlueCard claims. The member's Blue Plan Medical Policy applies to the interpretation and determination of medical necessity, medical appropriateness, investigational/experimental care, and clinical reviews as related to administration of the member's benefits and coverage.

## Claims Payment                                                        Return to Top

### How is a Provider payment determined?

- The local Plan applies pricing and reimbursement rules consistent with provider contractual agreements.

- The member's home Plan adjudicates the claim based on eligibility and contractual benefits.

### Who pays the Provider?

Provider payable claims will be paid by the local Plan based on the provider's contract and subject to the member's benefit plan.

## Medicare Crossover                                                    Return to Top

All Blue Plans crossover Medicare claims for services covered under Medigap and Medicare Supplemental products.  This will result in automatic claims submission of Medicare claims to the Blue secondary payer, and reduce or eliminate the need for the provider's office or billing service to submit an additional claim to the secondary carrier.

### How do I submit Medicare primary / Blue Plan secondary claims?

For members with Medicare primary coverage and Blue Plan secondary coverage, submit claims to your Medicare intermediary and/or Medicare carrier.

- When submitting the claim, it is essential that you enter the correct Blue Plan name as the secondary carrier.  This may be different from the local Blue Plan.  Check the member's ID card for additional verification.

- Be certain to include the alpha prefix as part of the member identification number.  The member's ID card will include the alpha prefix in the first three positions.  The alpha prefix is critical for confirming membership and coverage, and key to facilitating prompt payments.

Medicare Advantage                                                    Return to Top

### How do I handle Medicare Advantage (MA) claims?

For Medicare Advantage, submit claims to the local Blue Plan. Do not bill Medicare directly for any services rendered to a Medicare Advantage member.

- Ask for the member ID card.  Members will not have a standard Medicare card; instead, Medicare Advantage members have distinctive product logos on their medical ID card to help you recognize them.  All logos have the term "Medicare Advantage" in the design.

- Verify eligibility by contacting 1-800-676-BLUE(2583) and providing the alpha prefix.  Be sure to ask if Medicare Advantage benefits apply.

Please review the remittance notice concerning Medicare Advantage plan payment, member's payment responsibility and balance billing limitations.

### What does Medicare Advantage PPO Network Sharing mean?

If you are a contracted MA PPO provider with the local plan and you see MA PPO members from other Blue Plans, these members will be extended the same contractual access to care and will be reimbursed in accordance with your negotiated rate with your local Blue Plan contract. These members will receive in-network benefits in accordance with their member contract.

NOTE: If you are not a contracted MA PPO provider with your local Plan and you provide services for any Blue MA members, you will receive the Medicare allowed amount for covered services. For Urgent or Emergency care, you will be reimbursed at the member's in-network benefit level.  Other services will be reimbursed at the out-of-network benefit level.

### Contiguous Counties/Overlapping Service Areas

### What are the rules for filing claims in Overlapping Service Areas?          Return to Top

Submission of claims in Overlapping Service Areas is dependent on what Plan(s) the Provider contracts with in that state, the type of contract the Provider has (ex. PPO, Traditional) and the type of contract the member has with their Home Plan.

- If you contract with all local Blue Plans in your state for the same product type (i.e., PPO or Traditional), you may file an out-of-area Blue Plan member's claim with either Plan.

- If you contract with one Plan but not the other, file all out-of-area claims with your contracted Plan.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

GALEN HOSPITAL ALASKA, INC.
D/B/A ALASKA REGIONAL HOSPITAL,
HCA-HEALTHONE LLC D/B/A
HCA HEALTHONE
PRESBYTERIAN/ST. LUKE'S MEDICAL
CENTER, and D/B/A HCA HEALTHONE
ROSE MEDICAL CENTER, and
SAVANNAH HEALTH SERVICES,
LLC D/B/A MEMORIAL HOSPITAL
UNIVERSITY MEDICAL CENTER,

      Plaintiffs,

v.

HIGHMARK INC. D/B/A HIGHMARK
BLUE CROSS BLUE SHIELD,

      Defendant.

CASE NO.:

NOTICE OF REMOVAL OF ACTION
UNDER 28 U.S.C. §1441(c) (FEDERAL
QUESTION JURISDICTION)

ALLEGHENY COUNTY COURT OF
COMMON PLEAS
NO:  GD-26-001012

## <u>DECLARATION OF MARC POGONOVICH</u>

I, Marc Pogonovich, hereby declare and state:

1.      I am a Senior Paralegal at Highmark Health.

2.      I make this Declaration in support of the Notice of Removal filed by Highmark Inc.

("Highmark").  I have personal knowledge of the matters stated in this Declaration and could and

would competently testify to them if called as a witness.

3.      As part of my job responsibilities, I have access to and can research information

relating to the claims at issue in this lawsuit, including information relating to member account

records, policies and other documents.  I am also familiar with the various services and products

that Highmark provides.

4.      I researched and reviewed the plan documents related to the claims identified by

Plaintiffs' counsel as at issue in Plaintiffs' Complaint.  Based on my review of the plan documents, I have confirmed that at least 3 of the claims at issue involve employee welfare benefit plans governed by ERISA.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed this _9th_ day of March, 2026 in Pittsburgh, PA

Marc Pogonovich